## NEW YORK & QUEENS GAS CO. v. PRENDERGAST et al.

(District Court, S. D. New York. June 16, 1924.)

**1. Gas ⚖=14(1)—Constitutionality of rate statute.**

It is within the power of a Legislature to prescribe the form of charges by a gas company, and a statute prohibiting a "service charge" is in itself constitutional and valid; but when, taken in connection with another statute or order of a Public Service Commission fixing a maximum price for gas, it so reduces the entire permissible charge that it becomes confiscatory, it is unconstitutional.

**2. Constitutional law ⚖=135—Establishment of rate for gas company by Public Service Commission held to create contract, within Constitution.**

Where a statute creating a Public Service Commission authorized it to fix rates to be charged by a gas company for a period not exceeding three years, during which the rates should continue in effect, the fixing of such rate for a stated period and its acceptance by the gas company, which made considerable expenditures to adapt its plant and appliances to its requirements, created a contract between the company and the state, which is protected from impairment by the state by Const. art. 1, § 10.

**3. Statutes ⚖=64(2)—Statute relating to rates of charge for gas held not separable.**

A statute "in relation to charges for illuminating gas in cities of a population of 1,000,000 or over" fixed a maximum rate of charge, provided that the gas furnished should be a standard not less than 650 B. t. u. per cubic foot, and prohibited the Public Service Commission from making any change in the rate. Held, that the provision relating to the standard of quality was not separable, but was an integral part of the rate provision, not subject to change by the commission, and that where the rate so fixed was confiscatory as applied to a gas company the statute was unconstitutional and invalid.

**4. Gas ⚖=14(1)—New York statute relating to price and quality of gas held confiscatory.**

Laws N. Y. 1923, cc. 898, 899, relating to the price and quality of gas furnished by gas companies, as applied to a gas company in New York City, held unconstitutional and invalid, as confiscatory.

In Equity. Suit by the New York & Queens Gas Company against William A. Prendergast and others, constituting the Public Service Commission of the State of New York, and Carl Sherman, as Attorney General of the State of New York. On exceptions to report of Special Master, and motion for permanent injunction. Report modified and confirmed, and decree for complainant.

The opinion of Special Master James G. Graham, dated January 29, 1924, is as follows:

"The plaintiff is a corporation organized under the laws of the state of New York, engaged in supplying gas particularly to the inhabitants of the Third ward of the borough of Queens, in the city of New York. The defendants are public officers charged with duties in respect to the enforcement of the laws hereinafter referred to.

"By chapter 898 of the Laws of 1923, entitled 'an act to amend the Public Service Commission Law in relation to charges by gas corporations,' chapter 480 of the Laws of 1910 was amended by adding thereto a new subdivision, to be subdivision 6, of section 65, and reading as follows:

" '6. Service Charges Prohibited. Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed.'

"This act became effective on June 1, 1923, by the signature of the Governor of the state of New York. By chapter 899 of the Laws of 1923, entitled 'an act to amend the Public Service Commission Law in relation to the charge for illuminating gas in cities containing a population of one million or over,' chapter 480 of the Laws of 1910 was amended, by inserting therein a new section, reading as follows:

" '67-a. Charge for Gas in Cities of One Million or More. A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum.'

"This act further provided that it should take effect immediately, and it became effective by the signature of the Governor of the state of New York on June 2, 1923.

"This is a suit in equity brought by the plaintiff, the New York & Queens Gas Company, against the defendants, William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, and James A. Parsons, constituting the Public Service Commission of the state of New York, and Carl Sherman, as Attorney General of the state of New York, in which the plaintiff

seeks a decree declaring unconstitutional, illegal, and void, as unreasonable, confiscatory, and depriving the plaintiff of its liberty of contract and of its property, without due process of law and compensation, and as denying to it the equal protection of the laws, in contravention of section 10 of article 1 and the Fourteenth Amendment of the Constitution of the United States.

"Chapter 899 of the Laws of 1923 fixes $1 as a maximum price which gas corporations in the cities having a population of $1,000,000 or over may charge for gas sold to consumers other than the city of New York, the price to which is regulated by another statute. Plaintiff is one of the corporations designated in said section 67-a, and the city of New York is the only city in the state of New York having a population of over 1,000,000 inhabitants. The Third ward of the borough of Queens is included within said city.

"It is claimed by the plaintiff that the selling price of $1 per 1,000 cubic feet of gas furnished, fixed by the said chapter 899 of the Laws of 1923, does not permit the plaintiff to receive a fair and reasonable return upon the present value of its property used and useful in the manufacture and distribution of gas to its consumers in said Third ward of the borough of Queens, whether said price be taken alone, or in conjunction with the further provision in said act that the gas furnished shall be of a standard of not less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The plaintiff further claims that chapter 898 of the Laws of 1923 is literally susceptible of a construction that would compel the plaintiff, without compensation therefor, to do work and perform various services in connection with its gas business, and, if so construed, would be confiscatory. The plaintiff does not, however, urge that such is the only permissible construction which could be placed upon that statute, and, for reasons hereinafter explained, I hold that such a construction should not be placed upon that statute.

"By an order made by the Public Service Commission of the state of New York on August 30, 1922, effective October 1, 1922, the said commission, as then authorized by statute to do, fixed rates to be charged by plaintiff to its consumers (other than the city of New York), ranging from $1.15 per 1,000 cubic feet for the first 100,000 cubic feet of gas per meter per month to 95 cents per 1,000 cubic feet for over 1,000,000 cubic feet per meter per month, plus a service charge of 75 cents per meter per month (2½ cents per day). This latter charge was equivalent to about 22.57 cents per 1,000 cubic feet of gas sold by the plaintiff. Practically all the gas sold by the plaintiff comes within the first class. This service charge is prohibited by said chapter 898 of the Laws of 1923.

"The plaintiff claims that, if chapter 898 of the Laws of 1923, in so far as any provision thereof operated to limit the plaintiff to a rate of $1.15 per 1,000 cubic feet of gas sold, be held to be constitutional, the rate of $1.15 without the service charge would not enable the plaintiff to earn a fair and reasonable return upon the present value of its property used and useful in the manufacture and distribution of gas to its consumers. This charge of $1.15 was in effect for at least the one day which elapsed between the taking effect of chapters 898 and 899 of the Laws of 1923, and may be claimed to be the rate effective until the filing of a new schedule and its approval by the Public Service Commission, in the event that said chapter 898 is declared constitutional.

"By an order entered in its case No. 108 on August 30, 1922, closely correlated with its rate order as to the plaintiff on the same day, the commission had authorized all gas companies in New York City to furnish to their consumers gas which would 'have a total heating value on a monthly average (made up of the daily averages) *of not less than 537 British thermal units* per cubic foot, and a daily average (made up of the daily averages) of not less than 525 British thermal units per cubic foot on any three consecutive calendar days in any month.' The order further provided that the heating value of the gas furnished by a gas corporation should not, on any three consecutive calendar days, have a maximum variation upward of more than 5 per cent. of such monthly average heating value as the company did maintain and furnish under the above-quoted provision. The requirement for the furnishing of the quality of gas conforming to the British thermal unit standard was to become effective on and after October 1, 1922, that is, a month after the order was entered, so that the gas corporations affected by the order, including the plaintiff, were allowed a reasonable time to make the necessary preparation for changing the standard.

"By chapter 899 of the Laws of 1923, the Legislature prescribed that the gas supplied

in New York City should have a calorific content of *not less than 650 British thermal units* per cubic foot, measured under normal conditions of temperature and atmospheric pressure. As already quoted, chapter 899 of the Laws of 1923, in amending the Public Service Commission Law by adding section 67-a thereto, provided that the commission 'shall not allow a rate or charge in the case of such cities in excess of such sum' of $1 per 1,000 cubic feet. The act contained no provision expressly evidencing a legislative intent to prohibit the commission from hereafter changing the standard of 650 British thermal units. For reasons hereinafter discussed, I do not sustain the contention of this plaintiff that the requirement of gas of not less than 650 B. t. u. is an integral part of the statutory rate, or that it is inseparable from the $1 rate which is primarily attacked in this action.

"The special statutory court held unanimously that the plaintiff made out a case for an injunction restraining the taking effect of the acts in question, and, pending the final determination of the court, authorized the plaintiff to charge a rate of $1.38 per 1,000 cubic feet of gas sold except to the city of New York, such rate pendente lite being that prescribed by the Public Service Commission by its order in case No. 79, and its continuance under the temporary injunction was authorized on the basis that, during the pendency of the action, the plaintiff would continue to furnish gas of the quality then being supplied under the commission's order in case No. 108.

"By an order made by Hon. Francis A. Winslow, United States District Judge for the Southern District of New York, dated the 24th day of July, 1923, as amended by an order made on August 7, 1923, it was referred to me as special master to hear the evidence, make the computations, find the facts, and report the facts with my recommendations. The order appointing me fixed the 30th day of July, 1923, as the date on which hearings should commence, and provided that they should continue daily as nearly as possible until the completion thereof. Subsequently, by agreement of all parties and the consent of the District Judge, the parties were allowed until September 24, 1923, to complete their preparation for trial.

"From that day until November 26, 1923, I held sessions practically five days each week, except holidays, most of the time sitting morning and afternoon, and averaging six hours a day. There have been taken

1 F.(2d)—23

4,248 typewritten pages of testimony, and 261 exhibits have been introduced by the plaintiff, and 99 exhibits by the defendants. The minutes of the testimony have now been printed, and I shall file with my report a printed copy of the transcript.

"In accordance with the requirements of the order of August 7, 1923, and the accustomed practice in the trial of rate suits in equity in this district, I submitted to counsel for all the parties on January 23, 1924, a preliminary draft of my report, and of this opinion as well. On January 25, 1924, I received from counsel formal verbal and written statements embodying their suggestions and criticisms regarding the matters covered by said preliminary draft.

"Thereupon I have proceeded to complete and file my report and opinion in its present and final form, which alone is to be taken as completely embodying my findings and conclusions. In order that the court may know the essential facts from the great mass of evidence and exhibits herein, I purpose to present them as concisely as a proper regard for the issues will allow.

## "Organization of the Plaintiff.

"The New York & Queens Gas Company was incorporated on or about July 12, 1904, under and pursuant to the provisions of the Transportation Corporations Law of the state of New York, for the purpose of manufacturing and supplying gas for lighting the streets and public and private buildings in the cities, towns, and villages of the state of New York, and particularly in the borough of Queens, city of Greater New York.

"On July 18, 1904, the plaintiff acquired all of the capital stock and all of the bonds of the Newtown & Flushing Gas Company, which theretofore had been supplying gas in various portions of the borough of Queens, and having a manufacturing plant located in the village or town of Flushing, in the Third ward of the borough of Queens, and on or about the same day, pursuant to the laws of the state of New York, merged the Newtown & Flushing Gas Company into itself. It thus became the possessor and owner of all the real and personal property, franchises, and rights then owned and possessed or enjoyed by the Newtown & Flushing Gas Company, and all the business owned and developed by it and its predecessor companies.

"Since July 18, 1904, the plaintiff has extended and added to the business and properties so acquired until its investment therein has tripled, and the present value

thereof is even in excess of that amount, as is more particularly set forth hereinafter. The gas manufactured and distributed has always been what is known as carbureted water gas. Its manufacturing plant is located at the corner of Myrtle avenue and Farrington street, in the former village of Flushing, in the Third ward of the borough of Queens.

### "Characteristics of the Territory Supplied by the Plaintiff.

"The plaintiff is located in a growing section of the borough of Queens. The largest community supplied by it is Flushing, but it supplies also the villages or communities of Douglaston, Little Neck, College Point, Whitestone, and Bayside. These are thriving villages, but between the village of Flushing, in which the manufacturing plant of the plaintiff is located, and the various other villages, are large tracts of undeveloped land, with few, if any, consumers located thereon. The extreme point of delivery for the district is Douglaston, about nine miles, which is supplied under high pressure; but there are others running up to three or four miles from the point of manufacture, which are supplied under low pressure, as is the territory immediately contiguous to the plant. In some instances the mains have had to be laid through water or marshy lands, and in other instances entirely above ground, thus increasing the amount of loss of gas through condensation. At the present time there is being constructed an extension of the subway, at Flushing, which has and will necessitate a large amount of additional work on the distribution system and increase the expense thereof. The houses are mostly of a one-family type, with few apartment houses or large industrial concerns.

### "Methods of Business.

"The Consolidated Gas Company, which owns the entire capital stock of the plaintiff, makes contracts for supplying the coal, oil, and main material for itself and its affiliated companies, which includes the plaintiff, in bulk. The amount to be used by the plaintiff company for the ensuing year is estimated by the manager, and furnished to the Consolidated Company, and, as needed thereafter, the proper representative of the Consolidated Gas Company is notified, and orders are issued by him for the delivery of the required amount of oil and main materials; the coal orders going direct to the company with whom the Consolidated Company has contracted, and the bills for all supplies being rendered directly to the plaintiff, and paid by it to the party from whom purchased.

"The construction department of the Consolidated Gas Company does all the major construction work for the plaintiff at cost, and supervises such as may be done by independent contractors. Practically all the main and service work is done by the firm of Sullivan Bros., under a contract which has been in existence for a number of years; the prices at which the work is done being altered from time to time by agreement between the contractor and the plaintiff. The work of the contractor is supervised by a representative of the plaintiff, and his charges are checked by the auditing department of the plaintiff, as are those of the construction department of the Consolidated Company.

"The amount of oil delivered is measured at the works, although it is paid for on the basis of a certificate furnished by the inspectors of the Produce Exchange, whose measurements are those accepted by all the gas companies in and about New York; this method being provided in all such oil contracts. The coal is not weighed, except as used, and in the coal pile; but it is paid for as billed by the seller, with the confirmation of the bill of lading weights received from the railroad companies. On the other materials supplied and used it is comparatively easy to keep an accurate check. In fact, Mr. Little, the expert witness for the defendants, stated that he had no doubt all materials shown by the report, records, and books of the plaintiff were actually used as therein shown.

"The records are kept in each department of the company, which in turn are forwarded to the auditing department of the plaintiff, where they are assembled in various general books of account kept as provided by the uniform system of accounts established by the Public Service Commission. There are three principal departments: The distribution department, which has charge of the matters relating to mains, services, and meters; the manufacturing department, which has charge of matters relating to the making and supplying of gas; and the commercial department, which has charge of the records of gas used by the consumers, and the sales and renting of various gas appliances, and the collection of payments therefor from the consumer. There are various divisions of those depart-

ments, as required either by some regulation of the Public Service Commission, or for greater convenience in handling the business of the plaintiff; but the result of their operations is summarized in reports of those departments, and the whole is finally brought together in the general books of the plaintiff in its auditing department.

## "Operations.

"The plaintiff has submitted its results of operations for two periods—the calendar year 1922, and the so-called nominal year from September 1, 1922, to August 31, 1923, the latter period covering the last full year for which the company's books had been closed at the time of the trial, according to the accountant, Mr. Teele. In addition to that, plaintiff and defendants submitted estimated future results for the year from September 1, 1923, to August 31, 1924.

"The conditions under which the plaintiff operated varied during the two yearly periods first mentioned. Until October 1, 1922, it was making gas on the 22 candle power standard, receiving therefor $1.25 per 1,000 cubic feet of gas furnished, together with a service charge of 75 cents per meter per month. On August 30, 1922, the commission, after investigation and hearing, made two orders, one changing the standard of gas from the 22 candle power standard to a British thermal unit standard of not less than 537 per cubic foot on a monthly average, or 525 per cubic foot on an average for three consecutive days, and fixed a rate for the gas so supplied of from $1.15 per 1,000 cubic feet for the first 100,000 cubic feet per meter per month, to 95 cents per 1,000 cubic feet for all over 1,000,000 cubic feet per meter per month, and also allowed a service charge of 75 cents per meter per month.

"Having found that the gas appliances used by the plaintiff's consumers, in their existing state, were suitable for the consumption of gas of about 610 British thermal units, or more, the plaintiff, on October 1, 1922, started making gas of about 610 B. t. u., pending changes in the appliances on the district, and made this quality of gas for the balance of the year 1922, and until the spring of 1923, when it was gradually reduced to from 585 to 590 B. t. u., which is the standard of gas manufactured from the spring of 1923 on, after the gas appliances used by the plaintiff's consumers had been adjusted for the use of gas of less than 610 B. t. u. This is the quality

of gas which is being furnished since the granting of the temporary injunction by the statutory court, and which will, in all probability, be furnished for the full year August 31, 1923, to August 31, 1924.

"From the evidence before me I find that, if the plaintiff had supplied gas at the rate prescribed by chapter 899 of the Laws of 1923 ($1 per 1,000 cubic feet), the results of its operations for the year 1922, with federal income taxes eliminated, and no return whatever upon the present value of the plaintiff's property, would have been as follows:

| | Amount | Per M Cubic Feet of Gas Sold |
|---|---|---|
| Cost of production | $309,058.71 | $ .6469 |
| Cost of distribution | 186,586.21 | .3906 |
| Taxes (exclusive of federal income tax) | 31,702.82 | .0664 |
| Renewals and replacements | 14,330.73 | .0300 |
| Total operating expenses | $541,678.47 | $1.1339 |
| Miscellaneous operating revenue | 27,719.87 | .0580 |
| Net operating expenses | $513,958.60 | $1.0759 |
| Gross operating revenues from sales of gas at statutory rates: | | |
| Commercial sales ...... 475,999,000 c. f. at $1.00 | $475,999.00 | $1.00 |
| Municipal sales ...... 1,691,500 c.f. at $.75 | 1,268.62 | .75 |
| Total sales...477,690,500 c.f. | $477,267.62 | $ .9991 |
| Operating loss (exclusive of federal income tax) | $ 36,690.98 | $ .0768 |

And for the nominal year, September 1, 1922, to August 31, 1923:

| | Amount | Per M Cubic Feet of Gas Sold |
|---|---|---|
| Cost of production | $356,170.00 | $ .6177 |
| Cost of distribution | 211,722.58 | .3672 |
| Taxes (exclusive of federal income tax) | 31,846.05 | .0552 |
| Renewals and replacements | 17,297.96 | .0300 |
| Total operating expenses | $617,036.59 | $1.0701 |
| Miscellaneous operating revenue | 30,607.49 | .0530 |
| Net operating expenses | $586,429.10 | $1.0171 |
| Gross revenues from sale of gas since statutory rates: | | |
| Commercial sales ......574,623,400 c.f. at $1.00 | 574,623.40 | 1.00 |
| Municipal sales ...... 1,974,600 c. f. at $.75 | 1,480.95 | .75 |
| Total sales 576,598,000 c.f. | $576,104.35 | $ .9991 |
| Operating loss (exclusive of federal income | | |

"The figures shown in the above tables are based on the assumption, also, that the gas was of the kind and quality which the plaintiff actually supplied for the periods indicated. The figures are also exclusive of the cost of interest upon taxes, interest on consumers' deposits, expense of gas-rate litigation in the courts, and expenses of the plaintiff's rate proceedings before the Public Service Commission (other than one-fifth of such expenses included in the operating results above), claimed by the plaintiff as proper charges, but disallowed altogether by me, for the purposes of testing the constitutionality of the statutory rate, without prejudice to the plaintiff's rights as to these items before the rate-fixing tribunal. I have also deducted from the plaintiff's actual operating expenses, including the taxes actually paid, the amount of the federal income taxes assessed against the plaintiff's gas operations and paid, amounting to $6,153.74, or 1.29 cents per 1,000 cubic feet of gas sold, for the year 1922, and to $6,851.24, or 1.19 cents per 1,000 cubic feet, for the 12 months ended August 31, 1923. I have made this deduction in calculating the effect of a $1 rate, if the same had been in force during 1922 and 1923, for the reason that under such $1 rate there would have been no net earnings and so no federal income tax assessable or paid. There would likewise have been no federal income tax under a $1.15 rate, because the federal income tax is assessed only upon net earnings after providing for fixed charges, and the $1.15 rate would have yielded no excess over fixed charges.

"Although I have made this deduction for the reasons and the purposes stated, I desire to make it clear that, in computing the rate which the plaintiff is entitled to earn, viz. a rate sufficient to defray operating expenses and taxes, and yield, in addition, a reasonable return upon the value of the plaintiff's property, the plaintiff is entitled to have included in such item of taxes the amount of the federal income tax which would have to be paid upon such excess of earnings over expenses and other taxes. This is fully set forth in Judge Hand's opinion in Consolidated Gas Co. v. Newton (D. C.) 267 Fed. 231, and he therein laid down the application of the rule, and nothing herein is to be taken as in conflict therewith.

"If the plaintiff had furnished gas of the quality prescribed by said chapter 899 of the Laws of 1923, for those periods, instead of the quality of gas which it did actually supply, the cost of operation would have been increased at least 2.02 cents per 1,000 cubic feet of gas made for the calendar year 1922, or equivalent to about 2.25 cents per 1,000 cubic feet of gas sold, and about 4 cents per 1,000 cubic feet of gas sold for the nominal year ended August 31, 1923. This would have increased the operating loss for the calendar year 1922 to upwards of 11 cents per 1,000 cubic feet of gas sold, or approximately $53,000, inclusive of federal income tax, or to nearly 10 cents, or approximately $47,000, exclusive of the federal income tax, and for the nominal year ended August 31, 1923, to upwards of 7 cents per 1,000 cubic feet of gas sold, or approximately $40,000, exclusive of federal income tax, and to nearly 6 cents per 1,000 cubic feet sold, or approximately $33,000, exclusive of federal income tax; all of these sums being apart from any return upon the property devoted to the use of the plaintiff's consumers.

"For the year ending August 31, 1924, Mr. Woods, the chief engineer of the Consolidated Gas Company, and Mr. Spear, the general manager of the plaintiff, have furnished future estimates for the plaintiff, and Mr. Little for the defendants. The former gave two estimates, one based on the production of gas containing 650 B. t. u., and the other on gas of 537 B. t. u. Mr. Little states his estimate is based on the production of gas of the kind made by the plaintiff during the nominal year ended August 31, 1923, which is shown to have ranged from 585 to 600 B. t. u.

"The plaintiff's estimate of cost of making 650 B. t. u. gas is $1.0774 per 1,000 cubic feet of gas sold, and for 537 B. t. u. gas $1.0184. Deducting from these figures the same items I eliminated solely for the purposes of this suit, in my finding of the cost of gas sold for the year 1922, and the nominal year ending August 31, 1923, would make these estimates $1.0144 for 650 B. t. u. gas and 95.54 cents for 537 B. t. u. gas. Applying Mr. Woods' figure as to the difference between gas of the qualities above set forth and gas of a quality from 585 to 600 B. t. u. would reach a figure of 97.74 cents as the cost of making gas of the same quality which Mr. Little assumed for his figure. Mr. Little made a future estimate of 86 cents per 1,000 cubic feet for gas of a quality last above mentioned. I have checked his figures with care, making such corrections and additions thereto as were either developed on his cross-examination, or which I believe should proper-

ly be made, and this gives a result approximately 10 cents a 1,000 cubic feet more than he estimates, or between 96 and 97 cents per 1,000 cubic feet, substantially the same result as calculated by the plaintiff's witnesses. .

"This is a figure which, it seems to me, is as close as anything can be figured for the future. This would leave an operating revenue of 3 cents per 1,000 cubic feet for gas of the quality now being furnished, or 5 cents for 537 B. t. u. gas, or an operating deficiency of 1 cent per 1,000 cubic feet for the gas of 650 B. t. u. All these estimates as to cost for the year ending August 31, 1924, are based on the sale of 650,000 M cubic feet of gas for that year. Woods and Spear say such an amount of gas could not be made with the plant as it was on June 1, 1923, and assumed the use of the plant with the additions just made, and Little, while estimating it to be made with the plant as it existed on June 1, 1923, admitted that it would require its operation to the fullest capacity, and that such operation could not be safely conducted. However, this is not so important, as in neither event does it provide sufficient revenue to allow of anything like a fair return on the value of the plaintiff's property.

"Elements of Operating Cost.

"The conclusions I have reached as to operating costs for the various periods hereinbefore mentioned necessarily lead to the result that the rate of $1 per 1,000 cubic feet of gas sold, either with or without the 650 B. t. u. requirement, has been since its enactment and now is insufficient to provide revenues that will give a fair and reasonable return on the present value of plaintiff's property used and useful in its gas business. A reasonable return over and above operating expenses would not have been afforded during the period litigated, even if the commodity rate of $1.15 per 1,000 cubic feet, established by the Public Service Commission by its order of August 30, 1922, had been in effect as the rate chargeable, with the service charge of 75 cents per meter per month eliminated. In other words, the action of the Legislature, as of June 1, 1923, in prohibiting the further collection of the service charge as a part of the rate, left the company with only a rate of $1.15 in effect, and until this could be duly changed by the substitution of a new rate, which in form did not offend against chapter 898 of the Laws of 1923,

this company was left with only the $1.15 commodity charge, which was inadequate and confiscatory under the facts herein found.

"Some discussion of the figures making up such operating results seems proper, to enable the parties and the court to see how I arrive at my opinion thereon, and to judge of its correctness and value. In the first place, no one for the defendants questions that the expenditures were made which show on the books and operating records of the plaintiff. Mr. Little, their chief expert, states he had no doubt of it. He, as well as the witnesses for the plaintiff, states that the plant was operating efficiently and that it was conducted in a proper manner, having regard to the construction conditions prevailing at the time of the examination. Objection was made to certain items as either not properly in the operating expenses or that should be spread over a period of years, and most of such objections have been allowed by me for the purpose of this suit only. For the purposes of this suit I have eliminated interest on consumers' deposits and on unpaid taxes, expenses of rate cases in the United States court, and, for reasons hereinbefore stated, the federal income tax, and have spread the expenses of the rate case proceedings before the Public Service Commission over a period of five years, assigning only one-fifth thereof to the expenses of the years under consideration. On the other hand, I have also eliminated from operating revenue interest on bank balances as not properly revenue from operation. These changes produced the operating figures I have previously given for the year 1922 and the nominal year ending August 31, 1923, and are also reflected in the estimated results I have reached for the year ending August 31, 1924.

"In eliminating altogether from the plaintiff's actual operating expenses, for the purposes of this suit, the items of interest paid on consumers' deposits and on unpaid gas bills, and the item of the expense of the rate litigation in this court, and in spreading over a five-year period the expenses of rate litigation and other proceedings before the commission, I wish to make it clear that I do so only for the purpose of eliminating these controverted items from consideration in testing the constitutionality of the statutory rate. I do not pass upon the propriety of their inclusion in a rate-fixing proceeding before the commission, and my action in eliminating them from consideration in this case is only because I do not believe they

should be included when the validity of a legislative act is under review.

"Mr. Little's figures of 86 cents for 1923–1924 were arrived at by taking coal and oil at a figure less than the company was paying and was obliged to pay, ignoring the costs for water, rent, and other items which, on cross-examination, he admitted probably would have to be included, and excluding expenses on account of the sale and rental of appliances, excluding federal income taxes, and reducing many other items which I felt he was not justified in doing, these changes in all amounting to approximately 10 cents per 1,000 cubic feet of gas sold.

"The defendants' attack on the plaintiff's expenses for the year 1922 and the nominal year ended August 31, 1923, is, in the main, a general one, directed to the fact that the Consolidated Gas Company purchased the oil for the plaintiff and does certain work for it, and that its meters are repaired by the Standard Gaslight Company of the city of New York, a subsidiary of that company. No attempt was made to show that the coal, which was a large item and which was also purchased by the Consolidated Company, could have been purchased cheaper by the plaintiff directly, or that its general labor charges were not fair. As to repairs to meters, the prices paid were proved to have been less than could have been obtained elsewhere, but some suggestion was made that more meters were repaired than should have been necessary.

"The question of the oil contracts has been gone over in every rate case affecting gas companies in the past few years, and substantially the same objections have been urged to those herein presented. In no case have the courts found anything wrong or improper in these contracts, or that they were not for the best interests of the companies affected. Nothing new or different was presented here, and no reason for reaching a different result shown. In addition, the contracts herein were required to be and were filed with the Public Service Commission at the time, and if there had been any reason to suppose that they were not for the best interests of the company and the consumers it is to be assumed the commission would have taken some action in respect thereto. This it did not do. Even on the basis of Little's 86 cents cost of production and an investment much below that heretofore found by the court in the previous action, and as shown by the evidence before me, plus new additions since made at cost, the return would be so inadequate as to require judgment for the plaintiff on the rate imposed by chapter 899 of the Laws of 1923 either with or without the 650 B. t. u. limitation.

"Effect of Increased Sales on the Cost.

"It is an undoubted fact that there should be increased sales of gas in the plaintiff's territory in the year 1924, and I look for this increase to continue for a considerable period. To meet it, however, it has been necessary for the plaintiff to add very materially to its manufacturing plant, and it will be necessary to add to its distribution and commercial department expenses. More mains, services, and meters must be provided, and a larger force must be employed to care for its increased business. While there may be some reduction in general office expenses, the facts that the company now is operating with a small force of such employees, and that, while the unit of labor cost is about what it has been for the past year, the unit of material cost is higher, will tend to fully absorb any small reductions in other items.

"Trend of Prices.

"The uncontradicted evidence before me shows that, while the cost of labor has not increased during the past year, it has not decreased, and that the present level is likely to be maintained for some time in the future, and any change is liable to be upward rather than downward. As to materials, it was likewise the uncontradicted evidence as to most, if not all, of the items except oil, that prices were higher than a year ago and showed no tendency to decrease. As to oil, there has been a reduction from the time of the previous trial, which began a year or so ago, and has continued, and is shown in the operating cost. However, at the present time an upward tendency, even in that commodity, is indicated. Mr. Little takes the unit cost for the year ending August 31, 1923, for labor and material items as shown by plaintiff's books, for his estimate for the year ending August 31, 1924, and apparently believes them to be a fair basis for the future. Present prices for labor and material can no longer be regarded as abnormal. They have continued at about the present level for several years, and no one longer looks for a substantial lowering thereof for some years to come.

"Unaccounted-for Gas.

"Testimony was given as to the conditions under which gas was supplied in the company's territory as affecting its liability to

loss from condensation and other reasons, and the amount I have found is what was shown by the company's books. It is a variable item as to which no definite calculation can be made. Many different elements enter into it—condensation, friction, character of soil in which the mains are laid, condition of the pipes, care thereof, etc. In the case of this company its gas is sent long distances through small mains; some of its mains are exposed, some laid under water. All these elements operate to produce a loss of gas. The books showed this loss to have been 10.60 per cent. for the year 1922, and 9.29 per cent. for the nominal year ending August 31, 1923. For the year ending August 31, 1924, both the witnesses for the plaintiff and defendants have estimated a loss of something over 9.29 per cent. I see no reason, therefore, for making any change in this item from that shown by the company's records.

"Book Records of Cost.

"Long before the trial of this case the books and records of the plaintiff, as well as its plants and properties, were opened to representatives of the defendant Attorney General, both his accountants and engineers, in compliance with the order made by the District Court on August 7, 1923. Of course, the Public Service Commission already had the authority to examine them under the Public Service Commission Law. On the trial before me no serious attempt was made to impeach the accuracy of the books and records as kept. Differences of opinion were presented by the witnesses as to a few items, but on the whole I do not think the substantial accuracy of the books can be said to have been successfully challenged. They were kept in conformity with the uniform system of accounts prescribed by the Public Service Commission of the state of New York and under its supervision. This commission has full power to examine them at all times and require changes, if deemed desirable. The plaintiff's witness Teele stated that he had checked the books and records with bills, vouchers, and other underlying data and found them correct. They were present in court and available to examination of defendants' counsel and experts. Under these conditions, the courts have, in the recent gas litigations, held them to be admissible in evidence and as presenting a prima facie case, at least, as to the matters found in them. This was not overcome by anything presented by the defendants on the trial before me.

"Renewals, Replacements, and Taxes.

"No question was raised before me as to the propriety of the item of 3 cents per 1,000 cubic feet of gas sold to provide for renewals and replacements of property withdrawn from service. I have allowed this item.

"As to taxes, the defendants asked me to disallow the item for interest on unpaid taxes, and I have done so, for the purposes of this suit only. As to the item for federal income taxes, Mr. Little stated it was a question for the courts, and therefore he did not include it.

"In the case of Consolidated Gas Company v. Newton, supra, Judge Hand clearly indicated his opinion that it should be allowed in computing the amount which the plaintiff is entitled to earn, over and above operating expenses, and I think it is allowable under the decisions of the Supreme Court of the United States in Georgia Railway & Power Company v. Railway Commission of Georgia, 262 U. S. 625, 43 Sup. Ct. 680, 67 L. Ed. 1144, decided June 11, 1923, and Galveston Electric Railway Company v. Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. 678. As already stated, this is in no way contrary to my exclusion of this item in computing the results of operations in 1922 and 1923, had the $1 rate been in force.

"While in the estimate before me for the year ending August 31, 1924, this amount is not changed, if there was an increased revenue, this item would also have to be enlarged, but I have not altered the figures presented by plaintiff in this respect for that period.

"Test Period.

"The plaintiff has not put into effect the rates or standard of quality of gas prescribed by chapter 899 of the Laws of 1923. It has done away with the service charge which was in effect, as a part of the rate prescribed by the commission's order, until June 8, 1923, when the plaintiff, under the protection of the temporary restraining order granted by this court, was able to promulgate and put into effect a rate of $1.38, which yields approximately the same revenue which was yielded by the form of rate fixed by the commission. Authority to continue the $1.38 rate pendente lite was subsequently granted to the plaintiff by the special statutory court. To this extent the plaintiff has, since June 8, 1923, complied with the requirements of chapter 898 of the Laws of 1923. The only question now presented in this case, in so far

as concerns chapter 898 of the Laws of 1923, and its effect on the form of rate, is as to the confiscatory consequences of that statute from June 1 to June 8, 1923. All amounts collected by the plaintiff, under the terms of the preliminary injunction, in excess of the statutory rate of $1 per 1,000 cubic feet of gas sold, have been set up in suspense accounts, and are held by the plaintiff subject to the further direction of this court, as stated upon all gas bills sent to consumers for gas supplied after June 1, 1923.

"There are a number of cases where the margin between compensation and confiscation was a close one, in which the absence of a test period has been held sufficient ground for refusing relief, the principal one being Willcox v. Consolidated Gas Company, 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, the ground generally being that a reduced rate may result in a sufficient increase of business to so add to the revenues as to justify it. But in this case the overwhelming proof showed that the statutory rate would not cover operating charges, let alone produce sufficient revenue to give the plaintiff anything approximating a fair and reasonable return on its property, either on the original investment or the present value basis.

"In the previous litigation a rate of $1 was held insufficient only two or three years ago. The Public Service Commission of this state, one of the present defendants, stated in their opinion, as late as August, 1922, that the rate of $1.15 per 1,000 cubic feet of gas sold, plus a service charge of 75 cents per meter per month, 'could hardly be deemed adequate, if based only upon present conditions and present costs of manufacture, distribution, taxes, maintenance of property, and return upon investment,' and was based upon a belief 'that greater stabilization of prices and realization of certain prospective reductions in expenses would enable the rate thereby put in force to approach the requirements of adequacy.'

"The proof is that there has been an increase rather than a decrease in the unit price of labor and material—except of oil—since the date of that opinion, and that hope of a reduction of operating expenses has not been realized. The Supreme Court of the United States has also held that there should be, and I have, excluded from the rate base losses due to the fact that the rates heretofore prescribed by statute or by public authorities have been insufficient to yield a proper return.

"Under these circumstances it would seem to be a gross hardship to require the plaintiff to submit to further unquestioned losses to establish a fact which has been so recently passed upon by the courts and by public authorities, and where the impossibility of realizing the return to which it was entitled to so well established by all the evidence short of actual operation under the statute. This is not a case where the question of return is a close one, where an actual test of the operation of the statute may be necessary or desirable.

### "Fair Value and How to be Computed.

"In the previous trial of the suit brought by this plaintiff against the predecessor of these defendants, the special master found (and his decision was approved by the District Court and the Supreme Court of the United States) that the fair present value of the plaintiff's property was at least the amount of its original investment therein, and also found an amount which he said represented at least the investment as of January 1, 1920, made by the plaintiff. This finding was also approved by both the District Court and the United States Supreme Court. Inasmuch as he found that the rate was not sufficient even to pay operating expenses, the value of the property and the method adopted was not essential to the plaintiff's case and could not affect the result. In the other cases arising under the so-called 80-cent gas law (chapter 125 of the Laws of 1906), the original investment basis was taken in those relating to the Consolidated Gas Company and its affiliated companies, and for the Brooklyn Union and its subsidiary companies the value fixed by the public authorities for tax purposes was adopted; it being stated in the decisions in both series of cases that the purpose was to show that sufficient revenue was not produced to pay a fair and reasonable return on even the lowest and most conservative estimate of the value of the property of the plaintiffs in those cases. The decisions of the special masters in those cases were affirmed in both instances by the courts.

"Since the decision by the Supreme Court in those cases, it has rendered decisions in a number of other cases on this subject. It seems clear from these decisions that the plaintiff is entitled to a fair and reasonable return upon the *present value* of its property used and useful for the public benefit. It is not the value at the time it was installed

or at some period previous to the present that is to be taken. Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Commission, 262 U. S. 277, 43 Sup. Ct. 544, 67 L. Ed. 981; and cases cited; Bluefield. Waterworks & Improvement Co. v. Public Service Commission, 262 U. S. 679, 43 Sup. Ct. 675, 67 L. Ed. 1176; Minnesota Rate Case, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Elizabethtown Gaslight Company v. Board of Public Utility Commissioners, 95 N. J. Law, 18, 111 Atl. 729; Lincoln Gas Company v. Lincoln, 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968; City of Houston v. Southern Bell Telephone Company, 259 U. S. 318, 42 Sup. Ct. 486, 66 L. Ed. 961; Des Moines Gas Company v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244; Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Company, supra.

"There are many other cases to the same effect, and I think the Supreme Court of the United States has definitely settled the law to be that it is the *present* value of the property of the company used and useful for the benefit of the public, on which it is entitled to earn a fair and reasonable return. As to how this present value is to be determined, however, is not so clear. The plaintiff claims it is the present replacement cost which determines its present value. That such cost must be accorded proper consideration has been held in the Southwestern Bell Telephone Company Case, supra, the Bluefield Land & Improvement Company Case, supra, and other decisions. That a failure so to do is sufficient to require a reversal of the action of the Public Service Commission or other bodies was also held in the two last cited cases.

"But it would seem to me that the Supreme Court still adheres to the doctrine of Smyth v. Ames, 169 U. S. 466, 546, 547, 18 Sup. Ct. 418, 434 (42 L. Ed. 819), as it quotes with approval the language of that case that 'the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case,' in the very recent cases of Georgia Railway & Power Company v. Railway Commission of Georgia, supra, and Bluefield Land & Water Company v. Commission, supra.

"The plaintiff insists that it is the reproduction cost as of June 1, 1923, plus additions since that time, which is the measure of value, and has given proof on that basis. There is also before me evidence showing a minimum amount that the predecessor companies to the plaintiff had expended for construction, franchises, undistributable structural expenses, etc., the amount at which the plaintiff purchased the stock and bonds and property of the predecessor company, the additions made to the plant and distribution system up to January 1, 1920, as found by the court in a previous rate litigation and proven in this one, the net additions made by the plaintiff since that date down to June 1, 1923, and also what the further net additions in process and to be completed during the winter of 1923–1924 would amount to, as well as the total investment to these dates; also the cost to reproduce the plant and distribution system new as of June 1, 1923, October 23, 1923, and as of such time as the additions are to be finally completed and in operation and use; also the amount of the stock and bonds and indebtedness outstanding as of August 1, 1904, and June 1, 1923, the earning capacity of the plaintiff, assuming the rates prescribed by the statute under consideration had been in effect in the year 1922, and in the nominal year from September 1, 1922, to August 31, 1923, and an estimate of operating expenses and earning capacity for the year from September 1, 1923, to August 31, 1924, at the statutory rates. All these matters have been taken into consideration by me in arriving at my opinion as to the present value of the property of the plaintiff, on which it is entitled to receive a fair and reasonable return.

"At the time of the purchase of the property of the Newtown & Flushing Gas Company by the plaintiff, the total property and assets of the former were carried on its books at $694,678, exclusive of working capital. These assets were offered to and purchased by the plaintiff for the sum of $1,250,000, and paid for by the issue of $600,000 of stock and $650,000 of bonds. As of January 1, 1920, the evidence is that the investment amounted to at least the sum of $1,520,877.94, exclusive of working capital, or, with working capital therein allowed of $135,000, to $1,655,877.94. Since that date, to June 1, 1923, there has been net additions amounting to $408,311.33, making a total investment to June 1, 1923, of $2,064,189.27,

including working capital of $135,000 as of January 1, 1920, or $2,159,189.27, including working capital of $230,000 as of June 1, 1923.

"Adding to this investment the cost of the additions in progress and available for use during the present winter, amounting to $480,514.41, less withdrawals at original cost of $37,442.05, would make the total minimum investment as of the present time $2,602,261.43, including working capital of $230,000.00, the details being as follows:

| | |
|---|---:|
| Minimum investment as of January 1, 1920, exclusive of working capital.................. | $1,520,877.94 |
| Net additions January 1, 1920, to June 1, 1923.............. | 408,311.33 |
| Working capital as of June 1, 1923 ..................... | 230,000.00 |
| Total minimum investment as of June 1, 1923............... | $2,159,187.27 |

Net additions since June 1, 1923:

| | | |
|---|---:|---:|
| Total cost of additions ............ | $480,514.41 | |
| Less original cost of property withdrawn in connection with plant extension ......... | 37,442.05 | 443,072.36 |

Present minimum investment....$2,602,261.63

"The evidence satisfied me that the reproduction cost of the *tangible* property in its condition as of June 1, 1923, exclusive of the undistributable structural costs, would be the sum of $2,889,455.20, to which should be added working capital of $230,000, an amount for omissions and contingencies, organization and development prior to construction, cost of financing, engineering, superintendence, and general contractor's expenses, interest during construction, taxes on land during construction, and administrative, legal, and miscellaneous general expenses during construction; the foregoing being generally known as undistributed structural expenses. The plaintiff has given evidence that these undistributed structural expenses would amount to $898,247. There is no evidence that there have been charged, on the plaintiff's books, to its capital accounts, expenditures for such undistributable structural costs, amounting to $898,247, except to the extent that expenditures for such purposes were shown by the books of the Newtown & Flushing Company. This court in previous litigation, on the evidence then and as presented, found that the undistributable structural costs applicable to the tangible property acquired by the plaintiff on or about August 1, 1904, together with the value of certain intangible properties acquired therewith, amounted to at least $390,380.86,

and I think, on the evidence before me, at least this should be added to the reproduction cost of the tangible property and working capital.

"This would make the total reproduction cost of the property as of June 1, 1923, $3,509,836.06. I doubt very much if the sum of $390,380.86 could cover the full cost of the items above specified as of June 1, 1923, but for the purpose of this suit I feel it better to leave it at that unquestionable amount, as coming within the minimum percentage which the allowance for the undistributable structural costs ought to bear to the direct structural costs.

"In addition thereto, there might well be allowed a further amount for 'going value.' Galveston Electric Company v. Galveston, supra. This value is a substantial one, and, if added to the other items herein set forth, would increase the reproduction cost of plaintiff's property considerably above the amount above mentioned. But I prefer to determine a controversial item of this character against the plaintiff in testing the constitutionality of the statute, and for the purposes of this suit I have also omitted the item of 'going value' from the so-called 'rate base.' If to the reproduction cost as of June 1, 1923, as found by me, be added the additions to the property to be completed the present winter, amounting to $480,514.41, less withdrawals (at the unit prices as of June 1, 1923) of $79,138.66, the reproduction cost would be at least $3,911,211.81, made up as follows:

| | | |
|---|---:|---:|
| Reproduction cost of tangible property as of June 1, 1923, exclusive of undisturbed structural costs............ | $2,889,455.20 | |
| Working capital reasonably required as of June 1, 1923..... | 230,000.00 | |
| Undistributable structural costs applicable mainly to quantum of property acquired by plaintiff as of August 1, 1904, at least .................. | 390,380.86 | |
| Present value as of June 1, 1923, at least.................... | | $3,509,836.06 |

Net additions since June 1, 1923:

| | | |
|---|---:|---:|
| Total cost of additions ...........$480,514.41 | | |
| Less property withdrawn from use computed at the unit prices as of June 1, 1923.... | 79,138.66 | 401,375.75 |

Present value, at least     $3,911,211.81

"For the additions and extensions to the plaintiff's plant made since June 1, 1923, there was expended, up to and as of October 23, 1923, a net amount of $289,775.52, making the present value as of October 23, 1923

(including working capital of $230,000), an aggregate of at least $3,799,611.58, and the minimum original *investment* as of October 23, 1923, at least the sum of $2,448,964.79. On June 1, 1923, there was outstanding stock of the plaintiff amounting to $600,000 par value, and bonds to an amount of $816,000 face value, and it had debts amounting to $1,253,091, and other resources amounting to $40,705, a total of $2,709,796. The cost of operation and earning capacity at the statutory rate for the different periods has been specifically set forth hereinbefore. Taking all these elements into consideration, I have fixed the value of the plaintiff's property, used and useful for the benefit of the public, and on which it is entitled to a fair and reasonable return, at the sum of $3,509,836.06 as of June 1, 1923, and its present value at the sum of $3,911,211.81.

"In arriving at these figures I have placed a value on the lands of plaintiff of $106,128.70. The plaintiff's witness valued the lands in bulk at 60 cents a square foot. On the previous trial the special master placed a value on the portion then owned by the plaintiff on the basis of 40 cents a square foot. Since that time the plaintiff has purchased an additional tract adjoining the right of way of the Long Island Railroad Company, which was purchased in separate parcels, at a rate of 40 cents a square foot. I think the evidence fairly shows that this was the going price for separate lots 25 by 100 feet in the vicinity. For a plot of this size —over 200,000 square feet—with the facilities adjacent thereto, it seems to me an additional 10 cents per square foot might properly be added, and I have allowed 50 cents per square foot for the land. I have accepted the testimony of Mr. Simpson as to mains and services, as I do not think it has been successfully disputed.

"As to the appraisal of buildings and structures by Mr. Burt, and the appraisal of gas manufacturing plants and holders by Col. Miller, they each appraised the property at what it would cost to produce it as of June 1, 1923, *new*. Of course it is not 'new,' but Mr. Burt testified that it would take only $753.50 to put the buildings and structures in the condition in which they would be if new, and Col. Miller that it would take $1,844 to put the plants and holders in such condition. I think these amounts should therefore be deducted from the amounts set forth in their appraisal, in order to arrive at the present value of the buildings and plant. Meters I took as appraised by Col. Miller.

There was no substantial contradiction of his testimony on this point.

"The amounts allowed for general equipment, gas appliances, tools, and implements are in fact investment costs, and not reproduction costs, as the figures are taken from the plaintiff's books, and the same applies in the main to the $480,514.41 of additions from June 1, 1923, to date; but Col. Miller testified that the reproduction cost of miscellaneous items taken from the plaintiff's books would be at least the amounts so shown upon the plaintiff's books, and, as the additions since June 1, 1923, were made at prices recently current the amount expended for such additions fairly represents the reproduction cost thereof.

"Undistributed structural costs estimated by Col. Miller at $898,247, I have reduced to the amount of $390,380.06, as that is the amount previously found, as hereinbefore stated, and the only amount shown by the books to have been charged to these items, although I can readily believe that a larger amount would be necessary if the property were to be reproduced to-day. It will thus be seen that the so-called reproduction cost I have given of $3,509,836.06 as of June 1, 1923, and of $3,911,211.81 as of the present time was not entirely reproduction cost, but a combination of such cost as to certain items with investment cost as to others, plus an allowance for floating capital.

### "Working Capital.

"This is the amount required by the company to cover its varied requirements for accounts receivable, materials and supplies, cash, gas supplied, but not billed, gas in holders, but not sent out, prepaid insurance, and prepaid taxes, deposits with public authorities as security for performance of contracts, deposits with state compensation board, etc. I cannot find and do not believe there can be laid down any hard and fast rule on the subject of the *amount* of working capital. The requirements of no two companies are alike. The condition under which they operate affects the amount thereof. It varies from month to month and from day to day.

"A company developing its territory rapidly must keep on hand a larger supply of main service and meter materials than one which is not doing so. All companies charged with a responsibility of continuous operation have properly felt the necessity within the last few years of keeping large stocks of coal on hand in view of the troubles in

that industry. Companies receiving shipments of coal and oil by water are faced with the possibility of a stoppage of supplies by winter conditions and must stock up perhaps to a greater extent than companies which are in a position to obtain uninterrupted delivery. Some companies have greater storage facilities than others and can and do keep on hand greater quantities of materials, supplies and gas. Their cash balances tend to lower as the quantity of materials and supplies and gas increases and to rise as they lower. Its activities affect these subjects also. Consideration should be given to the amount of these various items as shown by the books of the company for various periods having regard to the conditions which may exist at prior and present times, the varying costs of materials and supplies, and many other conditions. I have only attempted to enumerate some which affect this question, to show how impossible it is to lay down any fixed rule or stated percentage on which to base it.

"There is, however, one feature asserted by the defendants with which I cannot agree. That is the claim that current liabilities should be deducted from the total of these other items. This claim was advanced in the previous rate litigations in this district, and disallowed in every case, and this action approved by the courts. It seems to me this claim carries its own refutation. The various items entering into this account are in the service of the public, and there is no reason why a consumer should not pay a return on them, whether they are paid for or not. That is a matter with which he has no concern. A very clear example of the fallacy of this claim was shown in the previous case of Brooklyn Union Gas Company v. Nixon, 2 F.(2d) 118. There Mr. Maltbie, for the defendants, declared that there should be deducted from working capital current liabilities, such as interest accrued, dividends declared and unpaid, accounts payable, and reserve for unpaid taxes, and also deposits with various state and city departments to secure contracts. He calculated in that case $430,000 for cash. Carrying out his theory would have resulted in reducing the working capital which the company should have to cash of $430,000 and of all other items to $283,249.30. Inasmuch as the plaintiff in that case had materials and supplies on hand $1,900,000, accounts receivable over $900,000, and gas unbilled and in holders over $900,000, and was carrying materials and supplies for all its subsidiaries and selling some 18,-

000,000 M cubic feet of gas, it is perfectly apparent that this reasoning produced an absurd result.

"In this case the plaintiff's witness, Col. Miller, estimated working capital amounting to $235,000 at 50 cents per M cubic foot. Mr. Spear estimated that it should be $280,000 for the ensuing year, giving the various items making up that amount. The average in the four accounts, cash, accounts receivable, materials and supplies, and gas supplied and not billed, for the first eight months in 1923, was $260,000. During 1922 the average was $115,000. The special master in the previous rate case allowed $135,000. During the past year the company undertook a considerable construction program, and, if the demands for gas increase, as seems likely, will have to supplement this by a large increase in its distribution system, necessitating a large supply of main, service, and meter materials. Its gas supplied and not billed would naturally also tend to increase. For the nominal year ended August 31, 1923, its average for the four items mentioned was practically $230,000. If there were added to these items above mentioned an amount for gas in holders and supplied, but not billed, prepaid taxes, and prepaid insurance, and any amount that may be on deposit with public authorities, the totals would be substantially increased.

"Taking all the circumstances surrounding the operations of the plaintiff at the present time and for the immediate future, I think it should be allowed at least the sum of $230,000 for working capital.

"Additions Subsequent to June 1, 1923.

"I have included in the present value of the plaintiff's property the net additions to its plant in course of construction, some of which were completed at the time of the hearing, and all of which, it was testified, would be finished and in operation during the winter of 1923–1924. These amount to $401,375.75. Previous to these additions, the plaintiff was being operated practically to its capacity, without proper reserve supply.

"In fact, there were proper days in the winter of 1922–1923 when, if there had been a breakdown of one water gas set, it could not have answered the demands made upon it. Mr. Little estimated a 15 per cent. increase for the present year, and I think the evidence justifies that or more. With the completion of these additions, it will have additional capacity, but not more than sufficient to meet the growth of the next two or three years,

and have the necessary reserve of 25 per cent. The defendants object to these additions being allowed, on the ground that at the time of the trial they were not all in actual use for the benefit of the public.

"In the Consolidated Gas Company Case, however, the special master allowed $2,250,000 for the new Astoria plant then building. The defendants excepted to this, but on review the District Court not only allowed it, but increased the amount to $4,500,000. This was a substantial part of the rate base therein allowed. On appeal to the Supreme Court of the United States the defendants again urged it should be rejected, as not then in use, and this point was set forth on their brief and argued. The Supreme Court approved the decision below. I think the similarity of facts between that case and the present one furnishes authority for my including this sum of $401,375.75 in the plaintiff's rate base, but whether it is included or not would have no effect on the decision of this suit.

"Inclusion of Prior Loss from Operations.

"The plaintiff also strongly urged that it was entitled to include in its rate base the amount it claimed to have lost from 1917 through 1921 in the operation of its plant, due to the failure of the rates limited by statute or by public authority to give it sufficient revenue to furnish a fair and reasonable return on the value of its property. The amount claimed was large, and, if admitted, would add greatly to its rate base. I decline to receive proof on this point, and have not allowed it in my figures, as I think the Supreme Court has clearly and definitely decided adversely to the plaintiff on this point. Georgia Railway & Power Company v. Railway Commissioners, supra; Galveston Electric Company v. Galveston, supra; Knoxville v. Knoxville Water Company, supra.

"Accrued Depreciation.

"On this subject the defendants claim that, in order to find the present value of the property for rate purposes, the court, in valuing the property, should deduct from the cost new a sum which will represent the accrued depreciation on the property from the time it was acquired and put in service up to the time when the inquiry is made, citing Knoxville v. Knoxville Water Supply Company, supra, and Minnesota Rate Case, supra. There are other cases in which reference is made to the replacement value 'less depreciation.' On the other hand, the plaintiff claims that, not only was no depreciation attempted to be proven by the defendants, but that none, in fact, existed, and no allowance should be made therefor, as repairs, renewals, and replacements provided by the company effectually take care of the plant and property, and as long as they are maintained in good and efficient operating condition, there can be no accrued depreciation, and none should be allowed for, citing the decision of the special statutory court for one of the Michigan districts in Monroe Gaslight & Fuel Company v. Monroe (D. C.; decided June 9, 1923) 292 Fed. 139, New York & Queens Gas Company v. Newton (D. C.) 269 Fed. 277, 285–287, 258 U. S. 178, 42 Sup. Ct. 268, 66 L. Ed. 549, and Consolidated Gas Company v. Newton, supra, and numerous other decisions in which the courts have ruled against a deduction for depreciation.

"One of the clearest expressions on the subject is that found in the opinion of Judge Learned Hand in the last Consolidated Gas Company Case, in passing on the special master's report. He there said: 'If the proper standard for a "rate base" is the present cost of a substitute plant of equal capacity, as I believe, depreciation can be a function of it only in case the allowance for renewals to the plant under consideration will in the future be greater than that of the assumed standard. If the rates allowed in the future include only an allowance for renewals of a new plant, the company will have to abate something from its normal profits because of its extraordinary renewal charges. Theoretically it makes no difference whether this problem is met by giving the plant a smaller value at present because of its future greater renewal charges, and then allowing a higher rate for renewals, or by giving it its present value, based on capacity, and letting it bear its extra renewals out of its normal profits. Were the plant sold, the future abnormal renewals would be reflected in the sale price, being discounted at once; but that would be because the parties must at present clear their accounts once and for all. The seller would be unwilling at once to abate from his price, and later to allow the buyer from time to time for his unusual renewals. In the case of a public service company, where the authorities may always require the plant to be kept up to standard, there is an obvious advantage in declining to attempt a repeated adjustment between the actual renewals necessary and normal renewals, as would be necessary if the present prospect of such allowances were now discounted; it is the

better practice to allow the plant to bear its own extra renewals, and to insist that it shall always be kept up. Therefore it appears that, so far as concerns the future, the age of the plant should not be a function in the "rate base." On the other hand, in computing the "rate base" from the original cost, depreciation is of vital consequence. Practical men will prefer to ascertain the cost of a present plant by experience, when they can, rather than by estimate, just as the master here has done. In so arriving at the cost of a present plant of equal capacity, it is clear that the original cost of the plant in question must be abated by depreciation, so far as that is reflected in a loss of capacity. In such a calculation, however, there must figure past renewals as an offset to past depreciation, and, if in fact the capacity has remained he same, depreciation should not be a function of the "rate base" at all. In such a case the inquiry as to depreciation should be confined to changes in "price levels." '

"He further said: 'The plaintiff proved the cost and the necessary repairs to bring the whole plant up to its original condition. It proved that the cost of reproducing fixtures of equal capacity was more than the book cost. That made a case in my judgment which was proof against any theory of "straight line" depreciation. * * * In accordance with the principle which I have tried to demonstrate, I decline to make any allowance for depreciation.'

"The referee in the case of Bronx Gas & Electric Company v. Public Service Commission, in the New York County Supreme Court in 1922 (P. U. R. 1923A, 255), said: 'There can be no possible use for a renewal and replacement fund of any considerable amount in the case of gas plants of considerable size * * * that have attained their gait, and where there is both theoretically and actually "a normal condition in which replacements come along with comparative evenness." Nor is there any necessity for building up a reserve for the purpose of counteracting a purely theoretical depreciation. Pioneer Teleph. & Teleg. Co. v. State, 64 Okl. 304, P. U. R. 1918A, 465, L. R. A. 1918C, 138, 167 Pac. 995. Such a reserve withdrawn from the rate-making base naturally effects a purchase of a part of the property for the consumer—a thing never contemplated. A rate fund for renewals and replacements should be provided and expended for that purpose; when this is done, as is the custom in every utility concern, depreciation is a very small fractional per cent. Ben

Avon v. Ohio Valley Water Co., 68 Pa. Super. Ct. 561, P. U. R. 1918A, 161. See, also, Ohio Valley Co. v Ben Avon Borough, 253 U. S. 287, P. U. R. 1920E, 814, 64 L. Ed. 908, 40 Sup. Ct. 527. In fact, if it be demonstrated, as in this case, that the plant is in good operating condition, and giving as good service as a new plant, then the question of a depreciation may be entirely disregarded. Murray v. Public Utilities Commission, 27 Idaho, 603, 150 Pac. 47, P. U. R. 1915F, 436, 441; Consolidated Gas Co. v. Newton, 267 Fed. 231, 265, P U. R. 1920F, 483. Any normally operated and normally and well-maintained gas plant has a perpetual service life. By annual renewals and replacements it is at all times maintained in the condition of properly serving its purpose. The * * * plant and distributing system, thus maintained, is perpetual, and the repairs, renewals, and replacements, which, according to the evidence in the case, have been made to it, eliminate both functional and physical depreciation or any kind of depreciation which would have taken place had it not been for the repairs, renewals, and replacements which were made. Nashville, C. & St. L. R. Co. v. United States, 269 Fed. 351.'

"The facts in this case show that the plant and property of the plaintiff are now in a high state of operating efficiency and are well maintained; repairs and replacements have been made as and when needed. Even Mr. Little, the defendants' expert, admitted this, and no evidence was offered by defendants as to any depreciation beyond the fact that the age of some of the structure was shown.

"It is generally conceded that the mains, services, and meters are capable of an indefinite life; the former, being underground and composed of steel or iron, show practically no deterioration with the years, and the meters are required by the regulations of the Public Service Commission to be placed in practically the same condition as new at certain intervals. The operating machinery continued to operate as efficiently as when new, so long as proper renewals and replacements of parts are made and care is taken in their maintenance and management. It is true that a time may come when certain units of machinery will be superseded, not because they have lost their efficiency, but because by reason of changes in the art it may have become more economical to replace them with new units.

"There are of course, expenses for renewals and replacements of minor items which may be said to be perishable, such as auto-

mobiles, hand tools, etc.; but their withdrawal from service and from the capital account creates merely an item of current operating expense and should be treated as such.

"There should be allowed to the plaintiff, to be included as an item in its operating expense, an amount necessary to provide a reserve against which may be charged the original cost of all property retired from service, plus the cost of dismantling the same, less the salvage thereof. Such reserve should be sufficient to cover such retirement losses as may reasonably be expected, in order that the burden of such losses may be as nearly as practicable equalized from year to year, and the sum so allowed should be in addition to the necessary cost of keeping the plant and equipment in a high state of efficiency through charges to the regular maintenance account.

"The plaintiff here has set aside the sum of 3 cents per 1,000 cubic feet of gas sold, for the purpose of providing a fund as above indicated, and I am of the opinion that this is a proper item to be included in its operating expenses, and, this being so, and the plant and property of the plaintiff having been maintained in a condition where it operates as efficiently as when new, I see no reason why an allowance for deterioration should be made.

"In view of these facts, I am unable to find any accrued or 'straight line' depreciation, as it is sometimes called. I have deducted the amount Mr. Burt and Col. Miller testified would be required to put the property in as good condition as new as showing the amount of the renewals and replacements necessary to be made in the so-called regular course of its business from future earnings, and because, as I already stated, they had based their appraisal on reproduction of the plant 'new,' and stated that these amounts would be necessary to put it in that condition.

"Two other questions remain to be considered; the 650 B. t. u. standard, and the prohibition of the service charge.

## "650 B. T. U. Standard.

"Chapter 899 of the Laws of 1923, after fixing a rate $1 per 1,000 cubic feet of gas furnished, proceeded in the same section to provide: 'Nor furnish such city gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure.' The plaintiff contends that that provision is inseparable from the one fixing the

rate to be charged for gas furnished; that, if the rate is found confiscatory, the standard fixed in the section falls with it; that, if this be not so, then that the provision fixing such standard is arbitrary, oppressive, unreasonable, unduly discriminatory, and unconstitutional, in that it denies to the plaintiff the equal protection of the law.

"The plaintiff bases its argument that it is discriminatory on the fact that it provides a standard for gas companies in cities of over 1,000,000 inhabitants (in effect the city of New York) different from that imposed on gas companies in other parts of the state. Plaintiff alleges that the provision as to measurement is indefinite, in that there is no fixed 'normal condition of temperature and atmospheric pressure'; that the statute took effect immediately, and that to have furnished gas of that B. t. u. without further change of appliances would have been dangerous to life and property; that it would take at least seven or eight months to again change the appliances to such a standard, and, even if such adjustments were made, it could not furnish a gas of that standard to the more remote parts of the district without impairing the efficiency of the appliances of those in the nearby portions; that to furnish gas of this standard to the extreme portions of the district would require the making of gas of a standard at the plant of as high as 700 B. t. u., which greatly increases the cost to the company and the consumer, and renders difficult, if not impossible, the adjustment of appliances throughout the district to the different qualities of gas which would be delivered under such a standard.

"There is no question from the evidence that it would require a very considerable time to adjust the appliances to this standard, if it could be done, and would cost a very considerable sum of money. To attempt to furnish the quality of gas required without such change would be more or less dangerous to persons and property, and, if such changes were made, it still would be uneconomical and inefficient. The higher content of hydrocarbons in a gas of such quality makes such gas more susceptible to loss from condensation, etc., thus increasing the amount of unaccounted-for gas. The appliances have once been adjusted to a standard prescribed by the Public Service Commission order of August 30, 1922. The order of the Public Service Commission fixing a standard for gas furnished provided full and complete directions for testing the same. The place where that test was to be made was one mile from the company's plant. It expressed the opinion

that there was no reason why the same standards should not apply throughout the state.

"It will cost at least 4 cents a 1,000 cubic feet of gas more than for the present quality of gas delivered, or more than 6 cents per 1,000 cubic feet of gas sold more than for gas of the quality permitted under the Public Service Commission order, and probably even more when the increased unaccounted-for gas and less efficient use thereof is taken into consideration. This will have to be borne by the consumer, and, if it should be enforced, would seem to justify a rate of at least $1.45 or $1.50 per 1,000 cubic feet on the basis of the rate given by the Public Service Commission in its order of August 30, 1922.

"Whatever differences of opinion may exist as to the desirability of this standard, it seems to me that the Legislature has the power to prescribe a B. t. u. standard of gas to be furnished and make it applicable only to the city of New York. It did this previously in the case of the 22 candle power standard. The· latter provision existed unquestioned for many years, and even when the rate prescribed in the same section was held unconstitutional, no such claim or decision was made in regard to the candle power standard. I think this construction, long acquiesced in, is of weight in the determination of this question. Rumsey v. People, 19 N. Y. 41.

"I doubt very much whether the provision that it should take effect immediately would be enforceable, in view of the indefiniteness of the test prescribed and the serious effect on life and property so to do without an opportunity being given to change the appliances and test the act; but I do not think the failure at all times to deliver to every consumer, wherever situated, gas of this quality, would be regarded any more seriously than the court regarded the failure to deliver at all times 22 candle power gas. Nor do I believe that the fact that the act took effect immediately on the signing thereof by the Governor, while it would require some eight or nine months to make the necessary adjustments to such standard, would impose any greater liability on the company than the order of the Public Service Commission, which took effect October 1, 1922, and was not fully complied with for some months afterwards, for I believe its enforcement would and should be enjoined until the company has an opportunity to test the. act, and after that to change the appliances.

"While the effect of a compliance with the standard addresses itself to the wisdom of the Legislature, it cannot be arbitrary· or unreasonable in its provisions as to the time of its taking effect, or subject the company to multiplicity of suits or large penalties without an opportunity to review the acts or comply therewith safely.

"Under the circumstances here shown, the plaintiff could not be required to incur the hazards of immediate compliance with the requirements of the statute to furnish gas of a minimum of 650 B. t. u. forthwith upon the taking effect of the statute, and could not be required to comply with this provision of the statute until 'it had had a reasonable opportunity and a reasonable amount of time for readjusting or causing to be readjusted the gas appliances of its consumers, in order to adapt them to the consumption of gas of the quality prescribed by the statute. Nor could the plaintiff, by the provisions of the statute making the standard requirement forthwith effective upon the approval by the Governor of the state of New York on June 2, 1923, be deprived of its right to a safe and adequate judicial review of the legality of the statute. Wadley Southern Railway v. Georgia, 235 U. S. 651, 35 Sup. Ct. 214, 59 L. Ed. 405; Bronx Gas & Electric Company v. Public Service Company, 190 App. Div. 13, 23–25, 180 N. Y. Supp. 38.

"Pending an opportunity to make the necessary preparations for furnishing gas of the standard required by the statute, and pending a judicial review of the constitutionality of the statute, the plaintiff was entitled to protection from any attempts on the part of the defendants, in pursuance of the provisions of the Public Service Commission Law or any other law, to enforce by summary proceedings or otherwise the ·provisions of the statute or to collect penalties for failure to comply with the statute, and also to protection from the multiplicity of suits which might arise if the plaintiff's consumers resisted the collection of bills for gas furnished by invoking the provisions of section 75 of the Public Service Commission Law, or any other claims or defenses of which they might be advised.

"The plaintiff was therefore entitled to a preliminary injunction, and secured it, restraining the enforcement of the standard provision of the statute pending the outcome of this litigation, and is now entitled to a continuance of the injunction pending a reasonable opportunity and a period of time for making such preparations as are deemed necessary in order substantially to comply with the requirements of the statute. The uncontradicted evidence is that the plaintiff

will require not less than nine months within which to make such preparation, and I find, and therefore recommend, that a suitable provision be made in the decree of the court enjoining the enforcement of the statute at least for such period of time, unless the Public Service Commission or some other competent public authority should make a valid order or establish a valid regulation relieving the plaintiff from compliance with such standard.

"Such a provision is essential for the protection of the plaintiff's rights, as the consequences of my holding that the standard provision of the statute is constitutional would otherwise be to require immediate compliance by the plaintiff with this provision of the statute, and, as I have already pointed out, the plaintiff may not be subjected to the hazards of penalty suits or to a multiplicity of actions, even though in such penalty suits or actions it might have a complete defense against the enforcement of the statute. Wadley Southern Railway v. Georgia, 235 U. S. 651, 660, 35 Sup. Ct. 214, 59 L. Ed. 405.

"My conclusion is that, while the standard provision of the statute must be sustained as ultimately constitutional, its immediate enforcement was properly enjoined as violative of the plaintiff's constitutional guaranties. This view I conceive to be in accord with the repeated holdings of the courts that a regulatory statute, such as that prescribing rates or otherwise regulating the discharge of the duties of a public service corporation may be constitutional or unconstitutional at different times, depending upon the conditions to which they are applicable, and that such statutes are not void upon their face.

"Nor do I think that the plaintiff was required to resort to any remedial powers which the commission might have in respect of the standard provision. In the first place, the constitutionality of the standard, as well as that of the separability of the standard provision from the rate provision, might not, by any means be free from doubt. The rate provision and the standard provision are of course closely related. The plaintiff was entitled to resort to equity for protection from the enforcement of the rate in question. The court in equity has power to grant full relief, even though an incidental part thereof might well be cognizable in another forum.

"Abrogation of the Service Charge.

"Chapter 898 of the Laws of 1923 added a new subdivision, to be known as subdivision 6, section 65, of the Public Service Commission Law, as follows:

" '6. Service Charge Prohibited. Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed.'

"The plaintiff claims that this provision may be construed to prohibit charges for services performed in connection with gas appliances sold or rented to consumers or for installing service connections within the consumers' premises, and thus result in taking its property without due process of law and denying to it the equal protection of the law. At the time of the passage of this act there was in effect the order of the Public Service Commission of August 30, 1922, fixing rates as previously stated, which included a service charge of 75 cents. This charge had been put in effect also by other companies throughout the state and its legality tested and affirmed by the Court of Appeals. While commissions and those best versed in the operation of gas utilities consider that it was a much more scientific method of fixing rates and more equitable to the consumers, there had been a great deal of agitation against it. So far as appears, there has been no complaint as to the charges with reference to gas appliances used by the consumer, nor the payment of charges for the installation of services within the consumers' premises.

"The statute is presumed to be constitutional unless the contrary is clearly shown. People v. City Prison, 144 N. Y. 529, 39 N. E. 686, 27 L. R. A. 718; People v. Briggs, 50 N. Y. 553, 558. A statute should be construed, whenever it is possible to do so, so that it shall be harmonious with the Constitution, to the end that it may be sustained. New York, etc., Railway Company v. Van Horn, 57 N. Y. 473; People v. Webb, 16 Hun, 42. Where a statute is susceptible of two constructions, the one conforming and the other in contradiction of the Constitution, that construction that conforms to the Constitution will be adopted. Robson v. Doyle, 191 Ill. 566, 571, 61 N. E. 435; Fougera & Company v. New York, 224 N. Y. 269, 279, 120 N. E. 642, 1 A. L. R. 1467; Metropolitan Board of Excise v. Barrie, 34 N. Y. 657.

"It seems to me that it is entirely possible to reconcile the provisions of chapter 898 of the Laws of 1923 with the Constitution, by giving weight to the rule of construction set

forth in the foregoing cases, and I therefore think the same should be held a constitutional exercise of the legislative right.

"The Effect of Upholding the Statute.

"Chapter 899 of the Laws of 1923 took effect June 2, 1923. Under these circumstances the plaintiff had no opportunity to file new schedules of rates under the provisions of the Public Service Commission Law, and if chapter 899 is held unconstitutional, then plaintiff claims the rate of $1.15 per 1,000 cubic feet of gas furnished (the rate established by the Public Service Commission order of August 30, 1922), without the service charge therein provided, would be unconstitutional and confiscatory of its property.

"In view of the finding I have already made as to the cost of operation and revenues received, together with the finding as to present value of the plaintiff's property, the evidence seems to justify a finding also that the rate of $1.15 provided by the commission's order without a service charge would not give to the plaintiff sufficient revenue to enable it to receive a fair and reasonable return upon the present value of its property used and useful for the benefit of the public.

"Rate of Return.

"The plaintiff presented evidence by testimony of witnesses as to the rate of return which a public utility company such as the plaintiff should earn on the amount required to build or buy its property. They placed this at 10 per cent. The courts have found, at different times and under varying conditions, rates of return ranging generally from 6 to 8 per cent. In Willcox v. Consolidated Gas Company, 212 U. S. 19, 48, 49, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, a rate of 6 per cent. was found not unconstitutional, in 1909. In Cedar Rapids Gas Company v. Cedar Rapids, 223 U. S. 665–670, 32 Sup. Ct. 389, 56 L. Ed. 594, a rate of 6 per cent. was allowed; the same in Des Moines Gas Company v. Des Moines, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244, 6 per cent.; in Lincoln Gas Company v. Lincoln, 250 U. S. 256, 258, 39 Sup. Ct. 454, 63 L. Ed. 968, 8 per cent.; in Brush Electric Company v. Galveston, affirmed United States Supreme Court (June 4, 1923) 262 U. S. 443, 43 Sup. Ct. 606, 67 L. Ed. 1076, 8 per cent.; in Minneapolis Gaslight Co. v. Minneapolis (C. C. A.) 285 Fed. 818, 830, 7½ per cent.; in Bluefield

Land & Water Company, supra, 6 per cent. was held too low; in Consolidated Gas Company v. Newton, supra, 8 per cent. was upheld; in Georgia Railway & Power Company v. Georgia, supra, 7½ per cent.

"The courts have stated that the fact that the company is entitled to include the federal income taxes in the operating expenses should be taken into consideration in fixing a rate of return. Georgia Railway & Power Company v. Railroad Commissioners, supra; Galveston Electric Company v. Galveston, supra. I believe, under the evidence and the decisions, the plaintiff might properly claim a return of 8 per cent. on the present value of its property used and useful for the benefit of the public. On no possible basis could it be found that it could earn, in view of my previous holdings, anything approximating this amount. But the question is not decisive in this case whether any given rate of return is or is not confiscatory, in view of my findings as to the results of operation.

"The Plaintiff's Claims as to Other Grounds for Holding Chapter 899 of the Laws of 1923 Unconstitutional.

"In its complaint, and in the proofs before me, the plaintiff urged insistently that the rates fixed by the order of the commission on August 30, 1923, were prescribed by the commission, under the authority of section 72 of the Public Service Commission Law, to continue in effect for at least the period of one year specified in the said order, and that the action of the plaintiff in accepting the commission's order, and reducing, on October 1, 1922, its rates as theretofore in force, was explicitly conditioned upon the continuance of the new rates in effect until at least October 1, 1923, and thereafter until the commission should by order prescribe a different rate.

"It seems unnecessary to summarize in full detail the facts upon which the plaintiff bases its contention that the state of New York had no legal or moral right, in May and June of 1923, to repudiate the provision of the order entered by the commission and establish a $1 rate to go immediately into effect. In view of my determination to base my decision solely upon the ground of the confiscatory character of the $1 rate, I shall not pass upon any question of contractual obligation or estoppel. The facts relied upon by the plaintiff to support its claim in this respect are documentary in form, and are set forth fully in the exhibits, as well as in the allegations of the complaint, and I

have summarized the facts in my findings. The question of legal or moral restraint I do not here pass upon.

"The same thing is true as to the various grounds of unlawful and unreasonable discrimination, which are urged by the plaintiff as further and additional reasons for adjudging chapter 899 of the Laws of 1923 to be invalid. The facts are in the record and in my findings. I rest my decision upon the ground that the rates complained of are confiscatory, and I leave to other tribunals any question of additional grounds for the same result.

## "Conclusion.

"There are other points of difference between the parties, but it is impossible, without unreasonably prolonging this opinion, fully to discuss them all. They are in most instances merely cumulative reasons for what I have already found. In fact, the finding as to cost of operation and revenue alone would be sufficient to condemn the rate. But this is the first of a series of cases in which the questions discussed here must necessarily be considered and decided. It is important in the trial of these cases that the rules of law to be followed should be settled as quickly as possible. While, of course, it is not possible to have a decision by the Supreme Court of the United States, it is possible to have one from the District Court, which will be a guide to the special masters in the trial of the other cases. For the purpose of giving the District Court the benefit of the review of the testimony, and the law as it appears to me, I have extended this opinion beyond the bounds of strict requirements. I have carefully followed the evidence as presented, and have reviewed and considered the same fully. My views on the law have been stated and applied during the trial, and my presentation of the facts to the court is based on such views. Long and exhaustive briefs have been presented by the parties, and the evidence is of considerable length. I have given these briefs and authorities cited therein full examination and consideration. I feel that the evidence and the law justifies my conclusions as to the unconstitutionality of the rates and as to the other questions discussed herein."

Shearman & Sterling, of New York City (John A. Garver, William L. Ransom, and Jacob H. Goetz, all of New York City, and George G. Bogert, of Ithaca, N. Y., of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Edward M. Deegan, of New York City,

Sherman C. Ward, of Albany, N. Y., and Melvin L. Krulewitch, of New York City, of counsel), for defendants Prendergast and others.

James A. Donnelly, of New York City (Judson Hyatt, of New York City, of counsel), for defendant Sherman.

WINSLOW, District Judge. This is a motion made by the plaintiff for a permanent injunction, based upon the report and opinion of the special master.

This action is brought by the plaintiff for an adjudication as to the constitutionality of chapter 898 and chapter 899 of the Laws of New York of 1923, relating to the price and quality of gas furnished by the plaintiff, and for a permanent injunction restraining the enforcement of these statutes. The motion brings on for final hearing in this court the report filed herein by the special master heretofore appointed to consider the questions of law and fact. This report contains a carefully prepared recital of the questions of fact and law and the master's findings, together with a well-considered opinion. The report recommends the entry of final decree in favor of the plaintiff.

The plaintiff, however, prays that certain exceptions filed by the plaintiff to the findings of the special master be sustained by this court, and that his report be modified accordingly, and then confirmed, as modified, and that final decree be entered in favor of the plaintiff, as recommended in the report, and as modified. The defendants have filed numerous exceptions to portions of the report. The master's report is so complete in detail that it is unnecessary here to refer to the facts, except in so far as it may be necessary to more clearly define and limit the opinion of this court.

Chapter 898 of the Laws of 1923, entitled "An act to amend the Public Service Commission Law, in relation to charges by gas corporations," added a new subdivision by way of amendment to the existing statute, as follows:

"6. Service Charges Prohibited. Every gas corporation shall charge for gas supplied a fair and reasonable price. No such corporation shall make or impose an additional charge or fee for service or for the installation of apparatus or the use of apparatus installed."

This act became effective June 1, 1923.

Chapter 899 of the Laws of 1923, the second statute involved in this litigation, entitled "An act to amend the Public Service

Commission Law, in relation to the charge for illuminating gas in cities containing a population of one million or over," amended the existing statute by inserting a new section, as follows:

"67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum." ·

This act became effective June 2, 1923.

The special master began his hearings promptly, shortly after his appointment, on or about July 25, 1923, and continued thereafter five days a week until November 28, 1923, holding morning and afternoon sessions. The number of seriously controverted questions of fact necessary to the determination of the issue are few. The real questions involved requiring careful consideration by the court are questions of law. At the outset, it is most important to emphasize what has been set forth in unmistakable terms by this court in N. Y. & Queens Gas Co. v. Newton, 269 Fed. 277, and affirmed by the Supreme Court, that this court is not a rate-making body. In this connection and at this juncture it is also most pertinent to call attention to the fact, undisputed on the record, that the Public Service Commission, whose present members are defendants herein, on August 30, 1922, prescribed a flat rate plus a "service charge" for gas, to be charged by the plaintiff, the total approximating $1.38 per 1,000. That rate was to continue for one year from October 1, 1922. Contemporaneously with the rate order, the commission prescribed the thermal content. Such action by the commission, fixing the rate and prescribing its continuance for one year, was pursuant to the authority of section 72 of the Public Service Commission Law (Consol. Laws, c. 48). These rates were duly accepted in writing by the plaintiff, to continue in effect, as stated, for one year.

The sole question now to be determined by this court is not one of rates, but whether or not the statutes are unconstitutional, because they are confiscatory, or for other reasons. In the opinion of the special master, both of the statutes, in so far as they limit the price charged for gas, are held to be unconstitutional, solely upon the ground that they are confiscatory.

Chapter 898, which became effective as of June 1, 1923, abolished the "service charge," and, as found by the master, thereby in effect reduced the rate of $1.38 theretofore fixed by the Public Service Commission to $1.15 per 1,000 cubic feet of gas. This statute was effective but one day, for the reason that chapter 899 became effective on June 2, 1923. This act prohibited the plaintiff and all other gas companies in cities of 1,000,000 or more—i. e., New York City —from charging a rate in excess of $1 per 1,000 cubic feet for gas of a calorific standard of not less than 650 B. t. u. per cubic foot, etc. It is therefore necessary to determine whether the $1 rate provided in chapter 899 is confiscatory, and whether the $1.15 rate temporarily limited by chapter 898 is confiscatory. The statute prescribing a maximum rate for gas of $1 per 1,000 cubic feet affects every gas company in the city of New York, and must be read in connection with the statute abolishing the "service charge," which, while in terms applicable to all gas corporations in the state of New York, when so read really affects only one in this jurisdiction, viz. the plaintiff.

The complaint prays for a permanent injunction against (1) the enforcement of chapter 899, viz. the $1 rate and the 650 B. t. u. standard, contending that both the rate and the thermal standard are integral and inseparable parts of that rate; and (2) chapter 898, which practically reduces the rate charged by plaintiff temporarily to $1.-15. Plaintiff asks that chapter 898, in so far as it be construed as meaning anything more than the prohibition of a so-called "service charge," be held null and void.

As to the contentions of the plaintiff, the special master's report recommends (1) that the $1 rate be permanently enjoined. (2) That the 650 B. t. u. standard is separable from the rate, and that it be enjoined for a period of time, nine months, which time it is said will be required for the plaintiff to adjust all appliances, etc., for the safe use of gas of this thermal standard. (3) That chapter 898, abolishing the service charge, be enjoined in so far as it limits the plaintiff to a rate of $1.15 per 1,000, but not enjoining its enforcement in any other particular.

The learned special master has held that the Legislature is free to fix rates and the form thereof, whether such rate be a flat rate, or a flat rate plus a "service charge." In either event, the rate must not be confiscatory. In regard to the flat rate prescribed by the other statute and fixing the thermal content, the special master has, in substance, held that the flat rate there provided is confiscatory, but that it is within the power of the Legislature to prescribe the thermal content, provided, however, that the gas corporation have a reasonable opportunity within which to adjust its appliances, so that the gas of the different thermal unit from that now furnished may be safely manufactured, transported, and consumed. In his opinion, the statute contains two separable provisions —one fixing a flat $1 rate, which he finds is confiscatory, and therefore unconstitutional, and the other separable provision regarding the thermal unit which he finds is a valid exercise of legislative power.

At the outset, it may be conceded that confiscation of the property of the public utility takes place when the utility is limited to a rate which does not provide sufficient revenue to pay cost of production and distribution and, in addition, a reasonable return upon its investment. A rate which yields an amount less than operating expenses and taxes in effect consumes capital. The confiscatory feature is further present if the rate prevents a reasonable return upon the investment. The master has found that for the year ended December 31, 1922, the actual net cost of manufacture and distribution, together with taxes and other operating expenses, but exclusive of any return upon the investment property, exceeded the rate now prescribed. It is obvious that such a condition would shortly wipe out all invested capital. For the year ended August 31, 1923, the master in the same finding found that the actual net cost of gas (aside from any return whatever) exceeded the rate prescribed. It is obvious that the deficiency in net operating expenses which would result from the $1 rate renders superfluous, even if it were proper here so to inquire, what a reasonable return upon investment may be.

The actual costs found by the special master are, of course, based upon the standards of light and heat observed during the periods mentioned. The master, however, found, and the record sustains that finding, that a thermal standard of 650 B. t. u. during the periods mentioned would have resulted in a net increase in the cost of production of gas, varying from 2.25 cents per 1,000 cubic feet, to 4 cents per 1,000 cubic feet of gas sold. Therefore, if both the $1 rate and the 650 B. t. u. standard were applied to the operations of the plaintiff during the periods mentioned, there would have been a very substantial deficiency in the bare operating expenses alone. The question of any return upon the investment in the instant case becomes academic.

In arriving at his conclusion, the special master eliminated certain items which the plaintiff contended entered into actual costs. It may be debated as to whether some of these eliminations were proper, but the findings, however, are conservative, and the net actual cost to plaintiff of gas sold by it during 1922 and the year ended August 31, 1923, finds ample support in the record; or, to put it another way, any production cost less than the figures stated would have been counter to uncontroverted facts in evidence. The master might have allowed certain elements of cost to be added, and thus increase the result, and justification for such increase might with some degree of reason be argued.

[1] In arriving at a just determination of the questions involved, it is quite necessary to consider the relations of the two statutes to each other. Considering chapter 898, which has reference to a "service charge," the special master is of the opinion, in which the court concurs, that it is entirely within the discretion of the Legislature to prescribe the *form* of the rate for gas, provided the legislative provision for the form does not in effect inflict a confiscatory rate. As chapter 899, prescribing the flat $1 rate, must be considered in the instant case while considering chapter 898, it follows, from the facts proven in the present instance, that the legislative enactments are both violative of the constitutional rights of the plaintiff.

The rate fixed for the plaintiff by the Public Service Commission on August 30, 1922, effective October 1, 1922, to which reference has been made, followed the litigation as to the validity of a statutory rate theretofore prescribed of no more than $1 per 1,000 cubic feet. That rate, theretofore prescribed by the Legislature and applicable to this plaintiff, had been adjudged insufficient to pay even the plaintiff's bare operating costs. 258 U. S. 178, 42 Sup. Ct. 268, 66 L. Ed. 549 (March 6, 1922). A similar adjudication had been reached in the New York state courts in regard to another gas company operating under very similar conditions to the plaintiff. The rate from October 1, 1922,

thus fixed by the Public Service Commission, and now abrogated and superseded by the legislative enactments under attack, fixed the service charge in conjunction with the commodity charge, as heretofore indicated.

The enactment of chapter 898, prohibiting the service charge, changed the form of the rate structure, and in theory left the plaintiff free to revise its rate schedules immediately, and, if revised, the same total revenue might be earned under a flat rate system as would have been earned under a service charge plus a commodity charge. The plaintiff, however, was precluded from increasing its commodity rates, so as to make up the revenue which would otherwise be realized from the service charge, by chapter 899 of the Laws of 1923, in effect June 2, 1923, limiting the maximum rate to a flat $1 per 1,000 cubic feet. No opportunity whatever could be provided plaintiff for a revision of its rates. For the brief period of time before the flat $1 rate became effective, the rate of the plaintiff was limited to $1.15. This rate the special master has found, as heretofore indicated, was also confiscatory.

The plaintiff contends that chapter 898 is unconstitutional on additional grounds. In view of the finding of the learned special master, with which I am in accord, it is unnecessary to discuss the additional grounds urged against the validity of this statute.

As to chapter 899 of the Laws of 1923, the learned special master has, in substance, held that the fixing of the flat rate of $1 is confiscatory, and this court is in full accord with that conclusion. But the master is of the opinion that this statute is separable into parts, one part of which, namely, the rate part, is confiscatory, and the other part, namely, the fixing of the calorific unit, is a valid exercise of power. Accordingly he recommends that the change to 650 B. t. u. be held in abeyance for nine months by a proper restraining order, to the end that a reasonable opportunity may be afforded plaintiff to adjust its appliances and plant and distributing agency to accomplish the desired result, and that the consuming public may be protected by such adjustment against the very obvious and serious dangers to human life and property. This phase of the problem and the conclusion of the learned special master require a most careful consideration of the statute and the application of the principles of statutory construction applied to legislative enactment.

The plaintiff has not put into effect the rates or standard of quality of gas prescribed by chapter 899. It has done away with the service charge forbidden by chapter 898, which, as we have seen, was equivalent to 22½ cents per 1,000, which was allowed as part of the rate prescribed by the Public Service Commission's order. On June 8, 1923, the plaintiff, pursuant to the temporary restraining order granted by this court, promulgated and put into effect a flat rate of $1.38, which yields approximately the same revenue as the form of rate fixed by the commission. Interference with this rate pendente lite was restrained by the special statutory court. This court concurs in the master's finding that chapter 898 of the Laws of 1923, in so far as it operates to prohibit the plaintiff from charging more than $1.15 per 1,000 feet, or in excess of the commission's graduated rates prescribed by its order, is illegal and void.

It would seem to be unnecessary to consider, in this case, the absence of a test period sufficiently long to arrive at a different conclusion, for the reason that in the instant case the overwhelming proof is to the effect that the statutory rate would not even cover operating charges, let alone the question of sufficient revenue to approximate a reasonable return on its investment whether that investment be considered either upon the theory of original cost or present value conditions.

In the previous trial of the suit by this plaintiff against the members of the then Public Service Commission, the special master found, and his decision was approved by both this court and the Supreme Court, that the fair present value of plaintiff's property was at least the amount of its original investment therein. In view of the fact that the statutory rate in the instant case is insufficient to cover operating charges and distribution, the question of a fair and reasonable return on capital is not one for the court to speculate upon. I do not believe that it is now the function of the court to determine a rate base, and hence the findings and opinion of the special master, so far as they relate to valuation on a reproduction cost basis, will be disregarded by this court in the instant case. This is in full accord with the expressed conviction of this court. Opinion by Mayer, J., N. Y. & Queens Gas Co. v. Newton, 269 Fed. 277. Whatever might be necessary in some other case, it would seem that the question of a rate base in the case at bar is a matter for the Public Service Commission, in the performance of its regulatory functions. It was quite prop-

er, however, for the master to make the inquiry regarding the various questions before him, in view of the direction of this court providing for his appointment.

In arriving at his conclusions that the statutes are confiscatory, the special master has eliminated, for the purpose of this suit only, many items said by the plaintiff to enter into the cost of manufacture and distribution of gas, which the plaintiff urges should be included in operating expenses. He has, for illustration, spread the expenses of the rate case proceedings over a period of five years, assigning only one-fifth thereof to the expenses of the year under consideration. Ordinarily this would, without question, be accepted as a wise and conservative adjustment. It would not be assumed that confiscatory legislative action would become a habit. The present enactment follows close on the heels of court decision. The excessive cost of litigating the intricate and complex questions involved in the case at bar, and in similar cases, will fall, as usual ultimately upon the individual consumer, and not upon the collective owners, whom we denominate the corporation. If it had been necessary, this court would have directed that the expense of such litigation be included in the year when incurred.

It would seem that a distinct advance had been made in the control of public utility corporations when a Public Service Commission was created, having facilities for investigation, deliberation, and regulatory control of these bodies, functioning with the aid of experts throughout the year, as contrasted with a legislative body, functioning for a brief period and concerned with the complex multiplicity of questions affecting the state and its divisions and citizens. The existence of the Public Service Commission, and the fact that it had established a rate for plaintiff by order of August 30, 1922, of $1.15, and a service rate of 2½ cents a day, or 75 cents per month, to continue for one year from October 1, 1922, equivalent to a flat rate of $1.38, did not deter the enactment of the statute under consideration.

[2] By section 72 of the Public Service Commission Law, the Legislature empowered the commission to fix the rate to be charged by a gas corporation, and also to establish a period, not exceeding three years, during which the rate so fixed shall at all events continue in effect, and thereafter until the commission shall fix a different rate. The Court of Appeals of the state of New York, in Saratoga Springs v. Saratoga Gas Co.,

191 N. Y. 123, 83 N. E. 693, 18 L. R. A. (N. S.) 713, 14 Ann. Cas. 606, referring to this statute, says that it contemplates the fixing of "a period of repose during which the rate should remain stable." This view has been generally accepted throughout the history of commission regulation, to the end that for a limited time the rate so fixed may not be disturbed, over the objection, on the one hand, of the company, or, on the other hand, of any party to the proceeding which resulted in the order.

The Public Service Commission fixed the rate and thermal content, to take effect October 1, 1922, and to continue until the 30th day of September, 1923. A certified copy of this order was served upon the plaintiff, and the plaintiff accepted, in writing, the terms and conditions of the order, and in compliance therewith filed and published, as required by law, its tariff schedules, setting forth its rates, etc., and otherwise complied with the terms and conditions of the Public Service Commission's order. This order effected a reduction of rates theretofore in effect. The acceptance and compliance with the order necessitated changes in its manufacturing plant and distributing system and in the methods of manufacturing and distribution of gas to consumers. It also necessitated changes in the adjustment of the various appliances used by the plaintiff's consumers in order to adapt them to the safe and efficient use of gas of the standard prescribed in the order referred to. This involved the expenditure of a large amount of money.

Before the expiration of this "period of repose" the Legislature by the enactment of the statutes in question, repudiated utterly the action of its agent, the Public Service Commission, acting pursuant to duly delegated power, and disregarded these terms and conditions, which had been accepted and acted upon by the plaintiff. The plaintiff contends that the fixing of the rate by the Public Service Commission and its acceptance by the plaintiff, accompanied by its expenditure of money to adjust its appliances accordingly, was a contract between the state and the plaintiff, and that the Legislature may not impair the obligation of this contract. It may be asserted that it is a well-established rule of law that a state may make a contract with an individual or with a corporation, and that such contract is entitled to the protection of the provisions of the United States Constitution as much as is a contract between individuals. It was long

ago said by Chief Justice Marshall "that a contract entered into between a state and an individual is as fully protected by the tenth section of the first article of the Constitution as a contract between two individuals. * * *" Providence Bank v. Billings, 4 Pet. 514, 560 (7 L. Ed. 939).

The court might be content to rest its decision sustaining the report of the special master on the conclusion that the legislation fixing the rate was confiscatory. The delegation to the Public Service Commission of certain powers of the Legislature was based upon an enlightened opinion, which recognized the fact that a body of experts, created expressly for the purpose, could better exercise a supervisory power and prescribe rates than could a legislative body with its multiplicity of responsibilities. This view does not conflict with the elemental power of the Legislature to abolish the commission or fix rates not violative of constitutional provisions.

I am of the opinion that the circumstances disclosed in this case, leading up to the making of the rate to take effect October 1, 1923, and to continue for a year, and its acceptance by the corporation, followed by the expenditure of considerable sums of money, constituted a valid contract for the period mentioned. Mobile Gas Co. v. Patterson (D. C.) 293 Fed. 208, at pages 219, 220. Its repudiation by the Legislature involves the impairment of the contract, which is properly the subject of judicial review. The court will not presume to comment upon the possible question of business integrity and honor. If the legislative body may deprive the plaintiff of its property without due process, or set at naught its contract, then all constitutional protection is gone for all persons.

[3] In regard to chapter 899, the special master held that its provisions were separate, part of which were valid and part invalid. To this finding the plaintiff has excepted. An analysis of this statute shows that there are three correlated provisions, but there is but one object: (a) It fixes a charge for gas of a prescribed quality. (b) It establishes a standard of quality for the gas to be sold at that price. (c) It prohibits the Public Service Commission from increasing this statutory rate for gas of the prescribed quality.

It is quite apparent that but a single result was sought by the Legislature; that is to say, the fixing of a standard of gas at 650 B. t. u. supplied in New York City at an un-changeable rate. If the object was to fix the rate of gas only, and were so stated, then it would have been possible for gas of many standards and qualities, and necessarily of varying costs of manufacture, to have been furnished. But the avowed purpose of the Legislature is indicated by the establishment, without interference of the Public Service Commission, of a rate of $1 per 1,000 cubic feet of a fixed and determined thermal unit.

It is unnecessary to cite cases in support of the well-known rule of statutory construction that the title of the statute may be considered for ascertaining the legislative intent. In this case the title refers to a "charge" for gas. If the 650 B. t. u. requirement is not an integral part of the "charge for gas," then the title of the act is incomplete and misleading. The last sentence of section 67-a prohibits the Public Service Commission, "notwithstanding any other provision of this chapter," from changing the rate. If the standard were a matter intended to be dealt with separately from the rate, the Public Service Commission would; notwithstanding the prohibition, have power; under section 66, subd. 3, Public Service Commission Law, to change the statutory standard of 650 minimum B. t. u. and in that way could possibly obviate the effect of the $1 rate, by making the production of gas cost less by lowering the minimum B. t. u. The language of the statute under discussion clearly did not contemplate leaving such power separately from the rate with the Public Service Commission.

The effect really of the legislation is to return to the candle power requirement of a former statute, whereas the uncontradicted evidence shows that the modern standard should be thermal, because of the present almost universal use of gas for heating, rather than for illuminating purposes. When, therefore, a thermal standard is prescribed, it is necessarily part of the rate.

[4] It is unnecessary further to refer to the facts regarding the enactment of these statutes, which matters are set forth in great detail in the master's opinion. The court is of the opinion that both acts, in so far as they limit the rate, are confiscatory, and therefore in violation of the United States Constitution; that the statute, chapter 899, by reason of its repudiation of the order of the Public Service Commission fixing the rate and establishing the thermal content for a year beginning October 1, 1922, further violates the provisions of the Constitution; and that chapter 899, as worded, is not sep-

arable in parts, but in its entirety offends the provisions of the Constitution.

The parties may submit a proposed decree and findings, in the form of final decree, in accordance with the views herein indicated, modifying the report, and, as so modified by such decree, the report will be in all respects confirmed.