## BRONX GAS & ELECTRIC CO. v. PRENDERGAST et al.

(District Court, S. D. New York. July 17, 1924.)

Gas ⬥14(1)—New York statute relating to price and quality of gas held confiscatory.

Laws N. Y. 1923, c. 899, amending Public Service Commission Law, by adding thereto section 67-a, relating to price and quality of gas furnished by gas companies, in New York City, as applied to particular gas company, *held* confiscatory, and therefore unconstitutional.

The opinion of Special Master James G. Graham, dated April 24, 1924, is as follows:

"The plaintiff is a corporation organized under the laws of the state of New York, pursuant to the provisions of the Transportation Corporations Law (Consol. Laws, c. 63), by a certificate dated August 16, 1893, and filed September 5, 1893, in the office of the secretary of state of the state of New York, and in the office of the county clerk of Westchester county, on September 8, 1893. It supplies gas and electricity in that part of the borough of the Bronx, city of New York, lying east of the Bronx river. At the time of the incorporation of the plaintiff, and for some time thereafter, the territory in question was a portion of the county of Westchester, but was subsequently annexed to the city of New York. The defendants are public officials charged with duties in respect to the enforcement of the statute hereinbefore referred to.

"This act further provided that it should take effect immediately, and it became effective by the signature of the Governor of the state of New York on June 2, 1923.

This is a suit in equity brought by the plaintiff, the Bronx Gas & Electric Company against the defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, Oliver C. Semple, and James A. Parsons, constituting the Public Service Commission of the state of New York, and Carl Sherman, as Attorney General of the state of New York, in which the plaintiff seeks a decree declaring the act unconstitutional, illegal and void, as unreasonable, confiscatory, and depriving the plaintiff of its liberty of contract and of its property, without due process of law and compensation, and as denying to it the equal protection of the laws, in contravention of section 10 of article 1, and the Fourteenth Amendment, of the Constitution of the United States. Plaintiff is one of the corporations designated in said section 67-a, and the city of New York is the only city in the state of New York having a population of over 1,000,000 inhabitants. The borough of the Bronx is included within said city.

"It is claimed by the plaintiff that the selling price of one dollar per thousand cubic feet of gas furnished, fixed by the said chapter 899 of the Laws of 1923, does not permit the plaintiff to receive a fair and

reasonable return upon the present value of its property used and useful in the manufacture and distribution of gas to its consumers in said borough of the Bronx, whether said price be taken alone, or in conjunction with the further provision in said act that the gas furnished shall be of a standard of not less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure.

"By an order made by the Public Service Commission of the state of New York on August 30, 1922, effective October 1, 1922, the said commission, as then authorized by statute to do, fixed rates to be charged by plaintiff to its consumers (other than the city of New York) ranging from $1.45 per 1,000 cubic feet for the first 100,000 cubic feet of gas per meter per month to $1.25 per 1,000 cubic feet for over 1,000,000 cubic feet per meter per month. Practically all the gas sold by the plaintiff comes within the first 'block' of this graduated schedule, and the average revenue derived by the plaintiff from the schedule as a whole is only a fraction of a cent less than $1.45 per 1,000 cubic feet of gas sold.

"By an order entered in its case No. 108 on August 30, 1922, closely correlated with its rate order as to the plaintiff on the same day, the commission had authorized all gas companies in New York City to furnish to their consumers gas which would 'have a total heating value on a monthly average (made up of the daily averages) of *not less than 537 British thermal units* per cubic foot, and a daily average (made up of the daily averages) of not less than 525 British thermal units per cubic foot on any three consecutive calendar days in any month." The order further provided that the heating value of the gas furnished by a gas corporation should not, on any three consecutive calendar days, have a maximum variation upward of more than 5 per cent. of such monthly average heating value as the company did maintain and furnish under the above-quoted provision.

"The requirement for the furnishing of the quality of gas conforming to the British thermal unit standard was to become effective on and after October 1, 1922; that is, a month after the order was entered, so that the gas corporations affected by the order, including the plaintiff, were allowed a reasonable time to make the necessary preparation for changing from a 22-candle power standard to a calorific standard initiated within the limits prescribed by the order.

"By chapter 899 of the Laws of 1923, the Legislature prescribed that the gas supplied in New York City should have a calorific content of *not less than 650 British thermal units* per cubic foot, measured under normal conditions of temperature and atmospheric pressure. As already quoted, chapter 899 of the Laws of 1923, in amending the Public Service Commission Law by adding section 67-a thereto, provided that the commission 'shall not allow a rate or charge in the case of such cities in excess of such sum' of $1 per 1,000 cubic feet. For reasons discussed in the New York & Queens Gas Company Case (D. C.) 1 Fed. (2) 351, I do not sustain the contention of this plaintiff that the requirement of gas of not less than 650 B. t. u. is an integral part of the statutory rate, and that it is inseparable from the $1 rate which is primarily attacked in this action, nor that it is an unlawful exercise of legislative power.

"The special statutory court held unanimously that the plaintiff made out a case for an injunction restraining the taking effect of the act in question, and, pending the final determination of the court, authorized the plaintiff to charge the rates prescribed by the Public Service Commission by its order in case No. 79, and their continuance under the temporary injunction was authorized on the basis that, during the pendency of the action, the plaintiff would continue to furnish gas of the quality then being supplied under the commission's order in case No. 108.

"By an order made by Hon. Francis A. Winslow, United States District Judge for the Southern District of New York, dated the 24th day of July, 1923, as amended by an order made on August 7, 1923, it was referred to me as special master to hear the evidence, make the computations, find the facts, and report the facts with my recommendations. The order appointing me fixed the 30th day of July, 1923, as the date on which hearing should commence, and provided that they should continue daily as nearly as possible, until the completion thereof. Subsequently, by agreement of all parties and the consent of the District Judge, the parties were allowed until November 26, 1923, to complete their preparation for trial.

"From that day until February 4, 1924, I held sessions practically five days each week, except holidays, most of the time sitting

morning and afternoon, and averaging five hours a day. There have been taken 3,302 typewritten pages of testimony, and 259 exhibits have been introduced by the plaintiff, and 131 exhibits by the defendants. In accordance with the requirements of the order of August 7, 1923, and the accustomed practice in the trial of rate suits in equity in this district, I submitted to counsel for all the parties on March 11, 1924, a preliminary draft of my report, and of this opinion as well.

"On March 24, 1924, I received from counsel formal verbal and written statements embodying their suggestions and criticisms regarding the matters covered by said preliminary draft. Thereupon I have proceeded to complete and file my report and opinion in its present and final form, which alone is to be taken as completely embodying my findings and conclusions. In order that the court may know the essential facts from the great mass of evidence and exhibits herein, I purpose to present them as concisely as a proper regard for the issues will allow.

"The circumstances under which this suit is determined differ from most of the litigations, in that the defendants have not sworn any witnesses on their own behalf, but rest their case on the evidence produced by the plaintiff, plus such exhibits as they have introduced during the progress of plaintiff's case. They take the position that the plaintiff has failed to sustain the burden of proof placed upon it under the decisions of the courts, and that therefore its complaint should be dismissed. The plaintiff's evidence has thus been left entirely uncontradicted on many points, especially as to the cost of the production and distribution of gas during the years 1922 and 1923.

"The solicitor for the defendant Public Service Commission submitted no proposed findings, but submitted a brief. The solicitor for the defendant Attorney General neither submitted proposed findings nor a brief, resting entirely on the motion to dismiss made by him at the close of the plaintiff's case.

## "Plaintiff's Territory.

"Plaintiff serves with gas and electricity a number of small communities in the eastern section of the Bronx, locally known as Westchester, Van Nest, Unionport, Throggs Neck, Crow Hill, the McGraw estate, the Mt. St. Mary estate, Classon's Point, and some others. At the time the plaintiff commenced doing business these communities were separated from each other by distances ranging from a half a mile to a mile, but with the growth of the population the distance between them has decreased, so that now the various communities, although not merged, are separated by sparsely settled sections, rather than by entirely undeveloped areas.

"The franchise territory covers about 15 square miles, including approximately 2½ miles of parks, squares, railroads, and a government reservation, scattered throughout the entire territory. When the streets are permanently regulated and graded, there will be 312 miles of them. Some 58 miles of the streets are now graded, and some paved. About 75 miles are not regulated and graded, but are open to traffic, and 181 miles are not open at all. The district originally comprised many large estates, which have been cut up from time to time. The plaintiff has approximately 79½ miles of mains of which 58 miles are laid in regulated and graded streets, and approximately 21½ miles are in unregulated and ungraded streets. Several miles of new streets are opened up each year, and the plaintiff has to serve the people residing on such streets, whether they are regulated and graded or not.

"The population in the area directly served by the plaintiff is between 56,000 and 60,000, and in the whole franchise territory about 75,000. The situation as to streets and the increase of the population has been such that it has imposed a considerable additional expense upon the plaintiff in the matter of laying mains and services, which would not be required in a settled community. Originally the people were grouped in communities, separated from the plant of the plaintiff and from each other, by considerable sections wherein there were no customers, thus necessitating the laying of mains through unremunerative portions to reach the developed areas; then, while it was necessary for the company to comply with the demands for service, many of its customers lived on ungraded and unregulated streets. When those streets were subsequently regulated and graded, the company generally had to relay its mains or abandon them and lay new ones conforming to the grade of the street, whichever was found the more economical. Portions of the territory consisted of low, moist ground, some of which has been now filled in, but in which the company's mains were laid in the moist ground. The section is a growing one,

mostly of small one and two story houses, and the company has found difficulty in keeping its plant and distributing system, both for gas and electricity, up to the demands upon it.

## "Control and Management.

"The Consolidated Gas Company, since 1921, has controlled the plaintiff by the ownership of about 75 per cent. of its stock, and through its officials exercises its direction in the matter of new construction of the plant and distributing system, and purchases all coal and oil. When the Consolidated Gas Company petitioned the Public Service Commission for leave to acquire the stock of the plaintiff, it stated that it was contemplating connecting the mains of the plaintiff company with mains of the Consolidated Gas Company. This has never been done. The plaintiff remains a distinct business and corporate entity, with practically the same officials and employees as it had formerly, about the only changes in its management being in the particulars above stated.

## "Method of Operation.

"While it has a plant for the generating of electricity, it was not operated during the period litigated before we used as a reserve or stand-by equipment, electricity being purchased from the United Electric Light & Power Company. It also purchases a small amount of gas from the Northern Union Gas Company, for supplying some of its consumers in a remote section of its franchise territory, where a connection with its own mains would be more expensive than the return would warrant. Its gas manufacturing plant is located on the east side of Zerega avenue, between Watson and Black Rock avenues. On the other side of Zerega avenue are located its relief and storage holders and other apparatus and equipment used in connection with its gas manufacturing plant. Others of its departments are located in buildings on Purdy street, and its main business offices are in the building on East Tremont and Frisbie avenues, which building also houses its display room and commercial office. Adjacent to it is a garage, and storage space for material. The portion of the land west of Zerega avenue is all used for the gas business of the company, that on the east side is divided between gas and electric business equally, that on Purdy street entirely in the gas business, and the office building and property at East Tremont and Frisbie avenues is used equally by the gas and electric departments of the company.

"This division of the land and buildings was determined upon by the officers of the company after a consideration of their respective uses, and no evidence was produced to show that such division was not properly made. The method of operation, the purchases of supplies, the keeping of records of the quantities and costs of the various items entering into the production and distribution of gas, are substantially as testified to in the New York & Queens and other gas cases which are or have been before the court in this district, and need not here be repeated.

## "Rate Base.

"As set forth in my opinion in the New York & Queens Gas Company Case, the plaintiff is entitled to a return on the *present value* of its property used and useful in the gas business for the benefit of the public. As I said there, it seems to me that the rule laid down in Smyth v. Ames, 169 U. S. 464, 546, 547, 18 Sup. Ct. 418, 42 L. Ed. 819, is to be applied, so far as practicable, in finding this value.

"The fact that the plaintiff company operates both a gas and electric business makes impossible the application of certain factors therein set forth. The evidence shows that it has outstanding as of June 1, 1923, stock of the par value of $486,500, mortgage bonds of a face value of $1,110,000 (issued with the approval of the Public Service Commission), debts amounting to $1,038,489.24, and other invested resources amounting to $257,395.04, or a total of $2,892,384.28. But, as these factors all apply to the entire property of plaintiff, it is impossible to say how much of these invested resources relate to the gas business alone. In any event, it seems to me, no great importance attaches to the amount or market value of the company's stocks and bonds. The value of the stock is affected by the amount of the bonds ahead of it, the value of the bonds by the ratio they bear to the total value of the company's property, and both are affected favorably or unfavorably by conditions in the money market totally foreign to any changes in the intrinsic value of the company's property. Stocks and bonds have been known to fluctuate in a year sometimes 10, sometimes 20, and sometimes 50 per cent., while the actual corporate assets may have been worth substantially the same amount all the time, and the

earnings produced the same return on the investment.

"I had before me the opinion of the Public Service Commission of this state, based on the best evidence it could find, as to the cost of the company's property as of December 31, 1908, which was as far back as could be gone toward finding original cost, in view of the fact that the records of original construction (which was by a construction company antedating the plaintiff company) had long since disappeared, if they ever existed in any detail. I had the present cost of reproduction, as testified to by plaintiff's witnesses. I had the cost of the property as shown by its books, brought down to December 31, 1923. That there could be no earning capacity under the prescribed statutory rate, and would have been none if it had been in effect during the past two years, was also shown. I think, therefore, the plaintiff has produced the evidence which the United States Supreme Court states should be presented in order to enable a judgment to be formed as to the present value of the plaintiff's gas property. I have set forth all of these details, either hereinbefore or in my findings, and they need not be here repeated.

"Taking all these factors into consideration, I have arrived at the sums set forth in my findings as to the amount invested by plaintiff in its useful gas property and the present value of the specified elements thereof. The value of the land I have taken as it is testified to by the real estate expert produced by the plaintiff as of June 1, 1923; the reproduction cost of the structures and manufacturing plant and holder station I have taken as testified to by the expert witnesses produced by the plaintiff, eliminating a portion of the estimated undistributable structural costs, less the amount they stated would be necessary to put them in the same condition as when new, and apportioned such value between the gas and electric business on the basis testified to by the officers of the company as to their respective uses, and as found by the engineer expert. The equipment at the Westchester Square office and garage, general equipment, gas appliances, and tools and implements are taken at their book cost, meters at the value testified by the expert witness (which is less than the cost shown by plaintiff's books), and mains and services at the amount testified to by plaintiff's witness with some modification.

"The present value as given by him for the mains and services is considerably less than the reproduction cost would be, if his evidence as to average conditions, and the cost to lay mains and services thereunder, is fully accepted, as the witness testified that he did not include any overhead, contractor's profit, supervision, engineering, nor anything but the bare cost of the labor and material. If those items were included, and they necessarily would have to be if the full reproduction cost were taken, their reproduction cost would be considerably higher than he testified. Perhaps the greatest difference between book costs, as claimed by the defendants, and the value given by the witness, is shown in these items for mains and services. It is more than twice the amount shown on the books. The evidence, however, shows that the company, in keeping its records of cost of mains and services, only included the labor and material, and did not include the full overhead.

"In connection with the item for mains, attention was called to the fact that the company in 1922 had laid mains of various sizes at a cost which, if applied to the whole system, would produce a figure considerably less than the one testified to. My first impression was that this evidence was not sufficiently full to give it the weight the defendant commission claimed for it. But a closer examination of the records in regard to these mains laid during the year in question discloses that there were laid about five miles thereof of various sizes in various parts of plaintiff's territory. The sections of the Bronx in which the plaintiff operates do not differ in regard to the character or extent of their occupation, nor as to the underground structures, to anything like the same extent as do the various portions of the territory in which the New York & Queens Gas Company operates, that of the borough of Manhattan, nor even the portions of the Bronx served by the other gas companies. I am inclined to think that so large a mileage of mains covers sufficient of the franchise territory of the plaintiff to furnish a very fair indication of the direct cost of laying mains therein.

"It is true the books do not disclose the entire cost, as it is testified that certain items of overhead are not there shown as applicable to the laying of mains, and to this extent the estimate of the defendant commission as to the cost of laying mains in plaintiff's territory based on such book figures is too low. At the same time I think they do indicate that the estimate of plaintiff's witness is too high. I have found a figure between what the plaintiff estimates

the reproduction cost to be, and the claim of the defendant commission, based on the costs shown by the books for the year 1922 and by its report to the Public Service Commission, which, in my judgment, more nearly represents the present cost of replacing the plaintiff's mains. Even the amount I have allowed is a very great increase over the original cost thereof as shown by the books, being about double that item; but material and labor costs on such work have greatly increased in the last few years, and, I think, justify the amount I have arrived at.

"This brings me to the last item, of undistributable structural costs. I have taken for this item only the amount shown on the company's books as applicable to the investment as of December 31, 1908, according to the ruling of the Public Service Commission. If full reproduction cost were to be taken as the basis for the rate base, this item would be very largely increased. As long ago as 1915, the Public Service Commission of this state, when it directed the plaintiff to rewrite its fixed capital accounts, made the following as proper allowances for such undistributable structural costs, to wit: Ten per cent. for contractor's profit; 5 per cent. for engineering and supervision; 5 per cent. for contingencies; 10 per cent. for preliminary and development expenses. It stated that it found these to be fairly representative of the amounts properly allowable for such items by the various Public Service Commissions and under the decisions in various cases cited.

"However, the amount allowed is all that appears on the company's books, and I feel it better, for the purposes of this suit only, to limit such costs as I have done. The amounts allowed for this item in this case, and in the New York & Queens Gas Company Case, are based upon peculiar conditions in each case, and not for any reason which, necessarily, would apply to any other case.

"The plaintiff claims to be entitled to a rate base of cost of reproduction new, without any depreciation. As to the latter, I had expressed my views in the New York & Queens Gas Company Case. In this case I have, however, taken the depreciated value of the property acquired prior to December 31, 1908, in accordance with the ruling of the Public Service Commission in finding the company's investment, inasmuch as the same was accepted by the plaintiff, and I do not feel it proper or necessary to determine this controverted question in this suit. Whether such action by the commission was proper and legal, or was not, I do not undertake to say, but for the purpose of this suit I have taken such value as they found and the company accepted for the portion of the investment now on hand acquired prior to December 31, 1908.

### "Five Million Cubic Foot Holder.

"The company is erecting on the west side of Zerega avenue a 5,000,000 cubic foot holder for the storage of gas. It already has two holders, one of 500,000 cubic feet and the other of 150,000 cubic feet. This will give it, with the completion of the new holder, a total storage capacity of 5,650,000 cubic feet. Col. Miller, the company's engineer expert, testified that the company should have a storage capacity of approximately two-thirds of its maximum daily output. Its maximum output this winter has been somewhere in the neighborhood of 1,800,000 cubic feet. Two-thirds of this would be 1,200,000 cubic feet. With the addition of the new holder, it will have a storage capacity more than four times the necessary amount as estimated by Col. Miller. Col. Miller also testified that it would be economical to construct a holder of larger capacity than he estimated for the plaintiff's immediate requirements, as the cost per thousand cubic feet decreases as the size of the holder increases; the difference between the cost of construction exclusive of foundations of a 500,000 cubic foot holder and one of 5,000,000 cubic feet being about $40 per 1,000 cubic feet. Mr. Rosenquest testified that the holder capacity would be needed to take care of the growth of the business in the ensuing years. It also appears that the construction of the holder of this size allowed the utilization of the whole of the vacant lot on the west side of Zerega avenue.

"From all the evidence before me, I believe that the construction of the 5,000,000 cubic foot holder was the exercise of good business judgment, having regard to the company's present and future output and the difference in the cost between a small and large holder; but at the same time I do not think the entire cost of this new holder should be taken into the present rate case. I have only taken in one-fifth of the cost of the holder and connections, and spread the balance over the succeeding four years. The rate base having been found for the purposes of this case as hereinbefore set forth, the primary question then

arises as to whether or not the plaintiff can obtain a fair and reasonable return thereon from revenues derived from the rate established by chapter 899 of the Laws of 1923.

"Results of Operation.

"The plaintiff has submitted three schedules prepared from its books and records by its accountant, Mr. Teele, showing the cost of production and distribution of gas for the calendar year 1922, the nominal year ended September 30, 1923, and the calendar year 1923. During the period from January 1, 1922, to the taking effect of the commission's order on October 1, 1922, the plaintiff operated under a 22-candle power standard. During the 12 months ended September 30, 1923, the average calorific content of the gas furnished by the plaintiff was about 610 B. t. u., and the average during the calendar year 1923 was about 600 B. t. u. During these respective periods it cost the plaintiff company to make and distribute gas as follows:

| | Year 1922. | Year Ended Sept. 30, 1923. | Year 1923. |
|---|---|---|---|
| Cost of production | $ .6610 | $ .7193 | $ .7435 |
| Cost of distribution, etc. | .3938 | .4084 | .4075 |
| Taxes | .1003 | .0724 | .0661 |
| Renewals and replacements | .0600 | .0600 | .0600 |
| Total | $1.2151 | $1.2601 | $1.2771 |
| Less miscellaneous operating revenue | .0682 | .0781 | .0947 |
| Total | $1.1469 | $1.1820 | $1.1824 |

"Had the plaintiff company manufactured and distributed gas of a thermal content not less than 650 B. t. u. during these periods, the net result would have been as follows:

| Year 1922. | Year Ended Sept. 30, 1923. | Year 1923. |
|---|---|---|
| $1.1586 | $1.2125 | $1.2175 |

"The above figures include the payments actually made by the plaintiff for federal income taxes during the year 1922 and the nominal year ended September, 1923, but are exclusive of certain other items disallowed by me as stated in my findings, and all of the above figures are exclusive of any return whatever upon the property or investment of the plaintiff necessarily devoted to the service of its consumers. The defendants did not introduce any testimony substantially disputing this evidence for the plaintiff.

"The plaintiff proved its operating expenses by its books of account, which were shown to have been kept in accordance with the uniform system of accounts prescribed for public service corporations by the Public Service Commission of the state, and under its supervision. Said books of account had also been checked by the accountants who prepared the schedules with the underlying data and vouchers in the company's files, and found to be correct, except in one or two minor instances, where such changes as were made by the accountants were against the company. Representatives of the defendant Attorney General have been afforded access to such books and papers, in conformity with the order of Judge Winslow herein, and the Public Service Commission, of course, had, at all times, the right of access thereto. The books of account and such vouchers as were called for by the defendants were produced in court by the plaintiff.

"Such expenses as were borne jointly by the gas and electric departments were allocated between them on a basis determined by the officers of the company, having relation to the relative benefits received by each department therefrom. The basis of such division seems fair and reasonable, and the defendants did not suggest any other or different one, nor present any proof showing that the division as made was not just and proper.

"It was not disputed that the quantities of materials set forth in the books were used, or that the amount of labor charged for was necessarily performed. The methods of purchase of the major supplies through the purchasing department of the Consolidated Gas Company were testified to. From such evidence it appears that it was the most economical method of so doing, and no better way was proved by the defendants to overcome the judgment used by the company's officers.

"It follows from this result that it was conclusively shown that to make gas of the quality actually made it cost 14.69 cents in excess of $1 for the year 1922, and in the year 1923, 18.24 cents, and if it had manufactured gas of 650 B. t. u. would have cost 15.86 cents in excess of a dollar in 1922, and 21.75 cents in 1923. I can see no way in which the plaintiff could have manufactured and distributed its gas in these years, either of 600 or 650 B. t. u., or even of 537 B. t. u., for any amount at all approximating $1, exclusive of any return whatever upon its property used in such manufacture, no matter at what amount it is valued.

"The defendant Attorney General does

suggest that it was the duty of the plaintiff to prove that it could not have united its mains with those of the Consolidated Gas Company, and bought its gas from it at a rate which would have given the plaintiff sufficient return to prevent chapter 899 of the Laws of 1923 being held unconstitutional. He bases his contention on the fact that, when the Consolidated Gas Company petitioned the Public Service Commission for leave to buy its present stockholdings in the plaintiff company, it gave as one of the reasons why it should be given such permission the possibility of connecting the plaintiff's system with its own, so as to enable an interchange of gas and set forth some reasons which made this desirable. That it could thus furnish gas at a rate less than $1 per 1,000 cubic feet was not one of them. In granting the order authorizing such stock purchase, no condition as to joining the plaintiff company's mains with those of the Consolidated Company was attached. The fact is that, although the Consolidated Gas Company bought the stock in question early in 1921, it never has united, and so far as appears does not intend to unite, the mains of the plaintiff with its own, or supply gas to the plaintiff company; but it has continued to operate the plaintiff company, as it is entitled to do, as a separate and distinct corporate and business entity.

"No question has ever been raised, so far as appears in the record, by the Public Service Commission or anybody else, as to its legal right so to do, and the defendant commission, on August 30, 1922, after hearings participated in by the city of New York, fixed for this plaintiff a rate of $1.45, at the same time it fixed a rate of $1.15 for all the other companies in the borough of Manhattan and the Bronx. In fact, the defendant Attorney General does not dispute this proposition, and I hold it is entirely within such right for the Bronx Gas & Electric Company to be operated as a distinct and separate corporation, manufacturing and distributing gas in the manner in which it has always been done. Of course, if it costs more than $1 to make and distribute the gas, there could be no return at all on the capital invested for that purpose.

"The facts as to cost of operation above set forth are such as to lead to the inevitable conclusion that chapter 899 of the Laws of 1923, so far as it prohibits the plaintiff company from charging and receiving an amount in excess of $1 per 1,000 cubic feet of gas furnished is necessarily unconstitutional and void.

"The Absence of Test Period under Statutory Conditions and Rates.

"The same reasons set forth in my opinion in the New York & Queens Gas Company Case apply on this question. This is the third time the courts have been called upon to pass upon the effect of a $1 rate for gas as it relates to the operations of the plaintiff. Such a rate was declared unconstitutional by Referee Williams in an action in the Supreme Court of the state of New York no longer ago than October 25, 1922, and his decision has just been affirmed by the Appellate Division in the First Department. He found that for the years 1919, 1920, and 1921 the reasonable cost of making and distributing its gas was in excess of $1, and consequently such a rate yielded no return on its capital investment.

"On August 30, 1922, the Public Service Commission of this state made an order authorizing this plaintiff to charge rates per 1,000 cubic feet for gas furnished its consumers, other than the city of New York, ranging from $1.45 to $1.25 per 1,000 cubic feet, dependent upon the quantity used, and said in said order: 'Although the facts known to the commission and confirmed by the analysis of exhibits in the conferences indicate that the rates now fixed by the commission could hardly be deemed adequate, if based only upon present conditions and present costs of manufacture, distribution, taxes, maintenance of property, and return upon investment, the commission feels confident that, upon the greater stabilization of prices and the realization of certain prospective reductions in expense, the rates hereby put in force will approach the requirements of adequacy.'

"The plaintiff has sought to capitalize as part of its rate base its losses sustained while operating under rates established either by statute or by the Public Service Commission, pending a determination as to their constitutionality. Under what I believe to be the settled law as laid down by the Supreme Court of the United States, I have refused to receive such proof, and have declined to consider such losses in finding a rate base. If the plaintiff should be compelled to put into effect, for any period, rates which have been twice found insufficient to pay operating expenses, let alone yield any return on the value of the property, the effect would be to inflict a grave injustice on this company and its stockholders. There is here no question of

a narrow margin between compensation and confiscation. No return at all is clearly shown under the $1 rate, and such showing should be sufficient in itself to authorize the declaring of the statute unconstitutional.

"Conclusion.

"As I have very fully discussed the various other questions involved in this suit in my opinion in the New York & Queens Gas Company Case, I have not thought it necessary to repeat them here, but refer to that opinion as expressing my views. As in the previous case, I decline to decide herein the merits of the various additional grounds urged by the plaintiff as reasons for declaring that this statute violates the fundamental law. That statute and rate are clearly confiscatory, and I rest my decision solely on that ground.

"In this case it is unquestionably established that the plaintiff's operating expenses exceed $1 by a substantial margin, exclusive of any return upon the gas property or investment, and have done so for at least the past two years, for the quality of gas actually supplied. It is likewise established beyond question that the plaintiff's operating expenses will be substantially increased by the cost of manufacturing and furnishing gas of not less than 650 B. t. u., as the statute requires that the plaintiff shall do, after the expiration of the period for which I recommend a temporary restraint. No reasons were suggested for believing that the plaintiff's actual and reasonable operating expenses will not continue to exceed $1 at any time in the future which can now be forecast. No return whatever upon its gas property would be received by the plaintiff under the rate and standard provided in chapter 899 of the Laws of 1923, and this act, so far as the rate provision is concerned, therefore should be declared unconstitutional."

Shearman & Sterling, of New York City (John A. Garver, William L. Ransom, and Jacob H. Goetz, all of New York City, and George G. Bogert, of Ithaca, N. Y., of counsel), for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y. (Harry M. Chamberlain and Charles F. Murphy, both of New York City, of counsel), for defendants Prendergast and others, constituting the New York Public Service Commission.

James A. Donnelly, of New York City, for defendant Attorney General of New York.

1 F.(2d)—25

WINSLOW, District Judge. This action is brought by the plaintiff to have chapter 899 of the Laws of 1923, providing for a charge for gas of $1 and prescribing the calorific standard of gas, declared unconstitutional, as confiscatory and void. The report of the special master, finding that the $1 rate is confiscatory as to this plaintiff by a wide margin, is more than justified by the record. In view of the opinion filed on June 16, 1924, involving the same question of law [N. Y. & Queens Gas Co. v. Prendergast et al. (D. C.) 1 F.(2d) 351, 371], it is unnecessary for the court to give further expression to this point herein.

The court concurs in the conclusion of the special master as to the confiscatory result of the rate prescribed. No question of a service charge is involved in this case. I desire to state, however, that I do not believe that the rulings of the special master against the plaintiff as to certain eliminated items which plaintiff contends should be included in operating expenses should be regarded as a precedent by a rate-revising body. The master, indeed, has ruled that only for the purposes of this particular case were such items eliminated, and that these rulings were without prejudice to the plaintiff's rights in another forum. The items of expense properly received in evidence in the record are more than sufficient to justify the master's conclusion.

A decree will be entered, confirming the master's report, except as modified by the views of this court set forth in the opinion in N. Y. & Queens Gas Co. v. Prendergast et al., as far as applicable, and, as modified by such expression of opinion, the report will be confirmed.

Decree may be settled on notice.